Westinghouse Electric & Manufacturing Co. *v.*
MacGregor, Appellant.

Argued April 18, 1944. Before Maxey, C. J., Drew, Linn, Stern, Patterson, Stearne and Hughes, JJ.

*William B. Jaspert,* for appellant.

*Jo Bailey Brown,* with him *Smith, Buchanan & Ingersoll* and *Brown, Critchlow & Flick,* for appellee.

334

OPINION BY MR. CHIEF JUSTICE MAXEY, June 30, 1944:

Plaintiff sued the defendant for an accounting and payment of royalties alleged to be due under a patent license contract dated November 16, 1937. The defendant in his answer asked to have the contract declared illegal, the patent invalid, and as a counter-claim sought recovery both of the royalties which have been paid and of damages allegedly arising under federal law.

The basic question in this case is well stated by the plaintiff-appellee as follows: "Did the trial court err in its holding that where a licensor sues to recover accrued royalties under a patent license contract which contains a clause requiring licensee to maintain licensor's prices for the patented product (such clause, however, not being in suit or observed by licensee), defendant cannot attack legality of the agreement as a whole by asserting invalidity of the licensed patent?" Appellee adds: "This question arises only because of a recent decision by the U. S. Supreme Court." (That decision was in the case of *Sola Electric Company v. Jefferson Electric Company,* 317 U. S. 173.) Appellee then says: "That case raises this question: Does the Sola case remove all estoppel of a licensee to attack validity when the license contract provides for price fixing?"

The trial court did not pass on the validity of the patent. Appellee concedes that if failure to pass on the validity of the patent was error, a new trial should be ordered and no other question need be decided in this court. If it was not error, then only the correctness of the decision of the trial court on the merits of the questions necessary to its judgment is involved. These questions are:

A. Does defendant's copper - phosphorus - tin solder come within the scope of the licensed patent?

B. Does defendant's copper-phosphorus-silver solder come within the scope of the licensed patent?

C. If the defendant's copper - phosphorus - tin solder does not come within the scope of the patent, can licensee

recover the royalties he has paid under the license on such solder?

This last question does not apply to the copper-phosphorus-silver solder for no royalty has ever been paid on it.

For several years prior to May 31, 1936, the defendant, MacGregor, was an employee of Westinghouse, and as such, became familiar with the composition and uses of a copper-phosphorus hard solder ("CP") then being made, used, and sold by the Westinghouse Company, and described in its Jones patent [1] #1,651,709. Immediately after leaving Westinghouse, MacGregor commenced the manufacture and sale of a hard solder like that made by Westinghouse, except for the addition of one-half of one per cent (.5%) of tin ("CPT"). Westinghouse sued MacGregor in the U. S. District Court, for infringement of its Jones patent, and this suit was settled by MacGregor's accepting from Westinghouse the license involved in this case. He paid royalties under it for four years in accordance with its terms.

Some time after execution of the license contract MacGregor put on the market a solder comprising approximately 90.5% copper, 7.5% phosphorus and 2% silver ("CPS"). When Westinghouse heard of this new solder it demanded payment of royalties thereon, and an examination of the books to determine the amount of sales thereof that had been made. MacGregor refused access to the books, and refused to pay royalty on this

---

[1] The "application" for the patent "claims" as an "invention": "1. . . . , 2. A brazing solder having a melting point between 700° and 900° C. containing phosphorus and copper as the main and essential constituents thereof. 3. . . . , 4. A solder comprising copper and phosphorus as the main and essential constituents thereof, the ratio of copper to phosphorus in said solder being greater than 4 to 1. 5. A method of uniting objects of copper which comprises placing an alloy containing copper and 6 to 9% of phosphorus there—between and heating said objects to a temperature sufficient to form alloys of copper and phosphorus with said objects. 6. . . . ."

CPS solder. At the same time, he decided to pay no further royalties upon the CPT solder, and demanded repayment of the royalties that had been paid on such solder, alleging that the payments had been made by mistake. In addition he now asks for damages in an unstated amount upon an unstated cause of action under the Sherman Anti-Trust Act (15 U.S.C.A., Secs. 1 and 2).

The present action was brought in the Court of Common Pleas of Allegheny County to recover the royalties due and unpaid upon the MacGregor licensed solders. Having been refused access to the licensee's books, and therefore not knowing the amounts of licensed solders that had been sold without payment of royalties thereon, the plaintiff prayed for an accounting to determine the amount of such sales, and consequently the amount of royalties due.

MacGregor filed a motion to dismiss the suit on the ground that the Court of Common Pleas had no jurisdiction to pass on the validity or scope of a United States patent. At the same time he filed a declaratory judgment suit in the United States District Court at Pittsburgh, asking that the patent be declared invalid and the license contract illegal.

The motion to dismiss in Common Pleas Court was denied, that Court holding that it has jurisdiction because the cause of action is the recovery of royalties under a contract between citizens and residents of Allegheny County. It ordered the accounting plaintiff prayed for. This appeal followed.

(A motion to dismiss the declaratory judgment suit in Federal Court was sustained, that dismissal was affirmed by the United States Circuit Court of Appeals, which held that the State Court has jurisdiction over the cause of action presented by the statement of claim.)

The first question for us to decide is whether the Sola case, supra, removes the estoppel ordinarily on a licensee to attack the validity of a patent when the license contract provides for price-fixing. Appellant contends that

the Sola case furnishes him with an exception to the general rule against a licensee's attacking the validity of the licensed patent. The license he has does contain price-fixing clauses.[2]

The argument of appellant is that since the license contains price-fixing clauses, that fact of itself gives him a right to assert the invalidity of the patent, thereby to establish unenforceability of any part of the contract, thereby to escape payment of the accrued royalties he has contracted to pay.

In the Sola case the Jefferson Electric Company had licensed the Sola Electric Company to manufacture and sell products under the former's patent, and required it to maintain the prices established by the Jefferson Company for its sale of the patented products and required Sola to pay royalty on the licensed products.

After having operated under the license for a considerable period, the licensee refused to pay royalty on

---

[2] Sections 5 and 6 of the license provides as follows:

"5. Westinghouse grants this license on the express condition that the prices, terms and conditions of sale for use or sale in the United States of America, its territories and possessions of brazing solders embodying the invention covered by said Letters Patent and so long as such brazing solders continue to be covered by said patent, shall be no more favorable to the customer than those which from time to time Westinghouse establishes and maintains for its own sales of similar or competing brazing solders under such patent to such or other similarly situated customer purchasing in like quantities. MacGregor shall be notified of all such prices, terms and conditions of sale fixed by Westinghouse.

The prices, terms and conditions of sale of Westinghouse may be changed by Westinghouse from time to time, notice being given MacGregor, but not less than five days' notice shall be given before any such change shall go into effect.

6. It is agreed that it shall be regarded as an evasion of this agreement amounting to a breach thereof for MacGregor to reduce Westinghouse's sale price or alter Westinghouse's selling terms and conditions of sale directly or indirectly either through its own organization, its agents or others by any device, subterfuge or evasion or by any means whatever or to make the prices lower or the terms or conditions more favorable than those set forth by Westinghouse."

certain of the licensee products and refused to maintain licensor's prices on those products, its reason being that the claims of the patent covering those products had been held invalid by the Sixth Circuit Court of Appeals in *France v. Jefferson,* 106 F. (2d) 605.

The Jefferson Electric Company then sued the licensee to recover the royalties withheld, and also for an injunction restraining the licensee from selling licensed products at prices below those established by the licensor. The Circuit Court of Appeals for the Seventh Circuit affirmed the District Court's order dismissing the counter-claim, 125 F. (2d) 322, ruling that petitioner, having accepted a license under the patent, was estopped to deny its validity. And treating the patent as valid it held the stipulation for control of the sales price of the patented articles manufactured by the licensee was a lawful exercise of the patent monopoly.

Upon certiorari to the U. S. Supreme Court, that court said: "The question for our decision is whether a patent licensee, by virtue of his license agreement, is estopped to challenge *a price-fixing clause* in the agreement by showing that the patent is invalid, and that the price restriction is accordingly unlawful because not protected by the patent monopoly (italics supplied). . . . Here a different question is presented [i.e. different from the question presented in *U. S. v. Harvey Steel Co.,* 196 U. S. 310]—whether the doctrine of estoppel as invoked below is so in conflict with the Sherman Act's prohibition of price-fixing that this Court may resolve the question even though its conclusion be contrary to that of a state court." The Court then declared "Such a restriction on the price of articles entering interstate commerce [as was imposed by the license contract in that case] *is* a violation of the Sherman Act save only as it is within the protection of a lawfully granted patent monopoly" (citing cases). "Agreements fixing the competitive sales price of articles moving interstate, not within the protection of a patent, are unlawful because

prohibited by the Sherman Act." In that case the validity of a price-fixing clause in the license agreement was challenged and that challenge could not be adjudicated by the Court until it first determined the validity of the patent, for only a valid patent could stand between that clause and its being adjudged as a violation of the Sherman Act. In that case the suit was to recover royalties withheld and also for an injunction restraining the Sola Company from selling licensed products at prices below those established by the licensor. In the instant case the issue is not whether the price-fixing clause is in violation of the Sherman Act. It is before the court as a matter of defence to a contract for royalties which had accrued. Defendant asserts the right to attack the validity of a patent because the agreement licensing him to make, use and sell that patent (Jones Patent No. 1,651,709) during a certain term contains a price-fixing clause. We reject, as did the court below, the contention of MacGregor, the defendant, that the presence of a price-fixing clause in a patent-license agreement gives the licensee the right to attack the validity of the patent, regardless of whether the price-fixing clause is involved in the litigation to recover royalties.

If the Sola case is to be given by the courts the sweeping interpretation the defendant gives it, the validity of every patent in the land would under circumstances akin to those we have here, be subject to collateral attack in any court. The Court below aptly said: "In the instant case the court has not been requested either directly or indirectly to require MacGregor to maintain Westinghouse prices. By his own testimony he has not maintained them. The price-fixing clause is not in issue. It is raised merely as a defense to a suit for accounting and payment of accrued royalties. The legality, the enforceability of the price-fixing clause is a moot question. We therefore do not propose to declare the Jones patent invalid. Whether the price-fixing clause in the license is legal or invalid is not before this Court. It is our judg-

ment that the decision of the Sola case does not control or determine the instant case."

It is clear that if the plaintiff was attempting to force the defendant to perform acts which would be violative of Federal laws *unless those acts were legitimatized by being done under the protection of a United States patent,* it would be necessary for the adjudicating court to determine at the outset the validity of the patent whose protection was invoked. An estoppel whose operation will result in a contravention of Federal Anti-Trust laws is outside the pale of judicial recognition. It follows that when an estoppel is invoked and the opposing party alleges that its application is inconsistent with a Federal law it becomes the duty of the tribunal to determine every fact which is relevant to the issue thus raised. The validity of any "protective" patent invoked by the propounder of the estoppel becomes such a determinative "fact."

In the instant case the plaintiff is not attempting to enjoin the defendant from selling the products he is licensed to sell, at prices less than those charged by the licensor. To grant the relief prayed for here does not result in anything which is interdicted by the Federal Anti-Trust laws. Therefore, the decision in the Sola case, supra, does not govern the decision of any issue raised in this case.

The next question to be decided is the one identified as "A" in the third paragraph of this opinion. As to this question, the court below found certain facts which showed that there was no substantial difference between plaintiff's patented solder and "the copper-phosphorus-tin solder" as made and sold by MacGregor.[3] The court

---

[3] This is the solder MacGregor was making when he was sued in Federal Court by the plaintiff for infringement of its "Jones patent." The suit was dismissed when MacGregor agreed to take the license involved in this Federal suit. Under the terms of that license, MacGregor agreed to pay a royalty of 10% of the sales price on solder made and sold by him which embodied the invention covered by the Jones patent. He paid $6,000 royalty on this solder and then declined to pay further royalties.

below found: (15) ". . . They are used and are interchangeable for the same purposes, by the same customers, for the same jobs." From the facts found by the court below on competent and sufficient evidence,[4] the court reaches the correct legal conclusion No. 1 that "MacGregor's copper-phosphorus-tin solder is within the scope of claims 1, 2, 3, and 4 of Jones patent No. 1,651,-709 and therefore comes under the terms of the license agreement."

As to the question identified as B in the third paragraph of this opinion, the court below on competent evidence found certain facts showing that there was no substantial difference between defendant's copper-phosphorus-silver solder and the patent owned by the plaintiff. The 11th finding of fact reads as follows: "The MacGregor copper phosphorus silver alloy comprising 90.5% copper, 7.5% phosphorus and 2% silver comes

---

[4] The solder made under the "Jones patent" consists of practically 93% copper and 7% phosphorus. The "competiting" MacGregor solder consists of approximately 92.25% copper, 7.25% phosphorus and .5% tin. The main and essential ingredients "are phosphorus and copper." MacGregor admitted that if the tin which in the amount of ½ of 1% he puts in the solder was omitted from that solder there would be "left a good workable solder." Walter A. Graham, "a non-ferrous metallurgist" of the plaintiff company testified that "he had occasion to use and see used for practical soldering operations, the three solders, namely, the Westinghouse phos-copper and the MacGregor phos-copper tin and the MacGregor phos-copper silver solder." When asked to tell "what differences there are in operating results in soldering with the Westinghouse phos-copper solder as compared with the MacGregor phos-copper tin solder," he answered: "In our experience we have not been able to find any noticeable difference of the three, the Jones and the two MacGregor solders. They are interchangeable for use in the same purpose and application." He was asked: "What has been your observation as to whether or not the addition of tin to the phos-copper solder by MacGregor has changed the characteristics of the phos-copper solder without tin?" The answer is "There is no observable difference in the practical application." He was then asked: "These two solders could be interchanged for the ordinary use for which each is designed?" He answered: "That's right."

within the copper phosphorus range of the original claims filed in the Jones application for solder containing less than 10% or from 6 to 9% phosphorus, . . ." The court's opinion pertinently states: "It is well settled patent law that the addition of minor ingredients, not included in the claims, which do not change the characteristics or alter the functional effects of the patented composition, will not avoid infringement. *Crozier-Straub v. Graham*, 28 F. (2d) 321, 325; *Lampus v. Crozier-Straub*, 41 F. (2d) 746."

From the well supported findings of fact of the court below, the second conclusion of law logically follows. It reads: "MacGregor's copper-phosphorus-silver solder is within the scope of claims 1, 2, 3, and 4 of the Jones Patent No. 1,651,709, and therefore comes under the terms of the license agreement."

Since the court found on legally sufficient evidence that the defendant's copper-phosphorus-tin solder and also the defendant's copper - phosphorus - silver solder come under the Jones patent owned by the plaintiff, and since the court properly found that the patent-license agreement is legal, it follows that its conclusions of law that (3) "Under the terms of the license agreement, MacGregor is obligated to account for all of the licensed solders that he has made and sold since November 16, 1937, and to pay royalty thereon as specified in the said license." and (4) "Plaintiff is entitled to an accounting to determine the amount of licensed solder that has been sold by MacGregor since November 16, 1937, upon which royalty has not been paid." must be sustained.

Since we have determined that the decision in the Sola case does not preclude the plaintiff's invoking the doctrine of estoppel, we could base our present judgment on the principle that a licensee cannot challenge the validity of a patent which is the subject of a license which he has accepted to sell or use that patent.

In *Headley v. Barber Asphalt Co.*, 292 F. 119, the U.S. Third Circuit Court of Appeals said at page 120:

"So long as the defendant enjoyed the benefit of the license agreement, manufactured and sold under the presumably valid patent, it must pay the stipulated royalties in question, all of which became due before the application for a reissue was filed, *whether the patent was valid or invalid.*"

In *Angier v. Eaton, Cole & Burnham Co.*, 98 Pa. 594, this court referred to "The recognized principle applicable to such [patent] licenses is that while the patent is apparently valid and the license is enjoying the benefit of its supposed validity, he is bound to pay the stipulated royalty, and cannot set up as a defence the actual invalidity of the patent; . . ."

See also *Patterson's Appeal*, 99 Pa. 521; *Kinsman v. Parkhurst*, 59 U.S. 289, and Walker on Patents, sec. 307.

The defendant also makes a counter-claim for royalties allegedly paid by mistake on the CPT solder. This counter-claim need not be considered in view of our conclusion that MacGregor's CPT solder does come within the claims of the "Jones patent." If we had decided that it did not come within the "Jones patent," the mistake the defendant made in paying royalties on it would be one of law and not of fact. Therefore, it would not justify recovery of any payments made under that mistake.[5]

The defendant also asks for an unspecified amount of damages because of the plaintiff's alleged violation of the Sherman Act.[6] At the trial the court excluded evi-

[5] See *Dampskibs Aktieselskabet Thor v. Tropical Fruit Co.*, 281 F. 740, 743; *Fink v. Farmers' Bank*, 178 Pa. 154; *Clark v. Lehigh*, 250 Pa. 304; *Shields v. Hitchman*, 251 Pa. 455; *Miners' & Merchants' Bank Case*, 313 Pa. 118.

[6] Shortly after the present litigation was begun MacGregor filed a suit for a declaratory judgment in the District Court for the Western District of Pennsylvania praying for an injunction against the enforcement of the license agreement alleging, inter alia, its illegality as being violative of the Anti-trust laws. In that case reported in 45 F. Supp. 236, Judge GIBSON said: "The facts alleged . . . show that the owner of a patent . . . entered into a license agreement with complainant wherein one of the conditions was that the latter would observe the same sale prices as the owner

dence relating to this claim for the reason that Section 7 of the Sherman Act gives sole jurisdiction in the matter of such a claim for damages to the Federal courts. The action of the trial judge in sustaining the objection made by plaintiff's counsel to offer testimony showing the damages to the defendant's business with the result of the enforcement of the price fixing clause under the license agreement, by Westinghouse was proper.

Further discussion of this case is not required. This case was well tried by Judge SOFFEL of the court below. The adjudication is comprehensive, the findings of fact are based on competent evidence and the legal conclusions are sound.

The judgment in the nature of a decree is affirmed; costs to be paid by the appellant.

of the patent. In other words, the patentee qualified the release of his lawful monopoly. This does not constitute a violation of the Anti-trust laws, . . . ." MacGregor now contends that if the *Sola* case had been decided by the United States Supreme Court before Judge GIBSON's opinion was written, instead of being decided as it was more than seven months later, "the court's view on the question of whether or not the price fixing provision is in violation of the Anti-trust laws would be modified." We do not agree with the defendant's contention.