## MACGREGOR *v.* WESTINGHOUSE ELECTRIC & MANUFACTURING CO.

No. 28.   Reargued November 14, 1946.—Decided January 6, 1947.

*William B. Jaspert* reargued the cause and filed a brief for petitioner.

*Jo. Baily Brown* reargued the cause and filed a brief for respondent.

*Acting Solicitor General Washington, Assistant Attorney General Berge, Charles H. Weston* and *Philip Marcus* filed a brief for the United States, as *amicus curiae.*

MR. JUSTICE BLACK delivered the opinion of the Court.

This case, like that of *Edward Katzinger Co.* v. *Chicago Metallic Mfg. Co., ante,* p. 394, this day decided, involves

the right of a patent licensee to defend a suit for royalties only under a licensing agreement which contains a price-fixing provision. Certain subsidiary questions are also raised.

Westinghouse Electric & Manufacturing Company owned Jones' Patent No. 1,651,709. The invention claimed was a brazing "solder comprising copper and phosphorus as the main and essential constituents." Westinghouse sued MacGregor for infringement. The litigation was settled, and MacGregor took a license from Westinghouse authorizing MacGregor to make, use, and sell solder containing the constituents described in Westinghouse's patent claim. MacGregor agreed to pay 10% royalties on the net selling price of the solder. Sections 5 and 6 of the license agreement, set out below,[1] required MacGregor to sell the solder for no less than the price Westinghouse

---

[1] "5. Westinghouse grants this license on the express condition that the prices, terms and conditions of sale for use or sale in the United States of America, its territories and possessions of brazing solders embodying the invention covered by said Letters Patent and so long as such brazing solders continue to be covered by said patent, shall be no more favorable to the customer than those which from time to time Westinghouse establishes and maintains for its own sales of similar or competing brazing solders under such patent to such or other similarly situated customer purchasing in like quantities. MacGregor shall be notified of all such prices, terms and conditions of sale fixed by Westinghouse.

"The prices, terms and conditions of sale of Westinghouse may be changed by Westinghouse from time to time, notice being given MacGregor, but not less than five days' notice shall be given before any such change shall go into effect.

"6. It is agreed that it shall be regarded as an evasion of this agreement amounting to a breach thereof for MacGregor to reduce Westinghouse's sale price or alter Westinghouse's selling terms and conditions of sale directly or indirectly either through its own organization, its agents or others by any device, subterfuge or evasion or by any means whatever or to make the prices lower or the terms or conditions more favorable than those set forth by Westinghouse."

charged its own customers. MacGregor paid royalties on solder he made and sold which contained only phosphorus and copper. Later he began to make and sell solders composed of phosphorus, copper, and tin, or phosphorus, copper, and silver. For a time he paid royalties on these. But he also applied for and obtained patents on these two latter solders which added tin and silver respectively to the phosphorus-copper combination.[2] MacGregor then declined to pay royalties on these solders on the ground that they were not covered by Westinghouse's patent. Westinghouse brought this suit for an accounting and payment of unpaid royalties in a Pennsylvania state court. MacGregor filed an answer denying liability and asserting a counterclaim. His answer asserted that the solders which were described in his patents were not covered by Westinghouse's patent. He alleged that the effort of Westinghouse to make him pay royalties on these solders constituted an unlawful exercise of Westinghouse's patent monopoly and that Westinghouse should not be allowed to recover in the courts for this reason. In a counterclaim, he maintained that by inadvertence and mistake he had paid royalties on solders covered by his own patents. He charged that if the Westinghouse patent should be construed to cover these latter solders, it was invalid. He further contended that the price-fixing provision was a violation of the Sherman Act and the Clayton Act and constituted an unlawful use of Westinghouse's patent monopoly which rendered the whole license agreement illegal.[3] In his counterclaim MacGregor asked, not

---

[2] Copper, phosphorus and tin solder is Patent No. 2,125,680; copper, phosphorus and silver solder is Patent No. 2,162,627.

[3] The agreement to fix prices, if unlawful at all, was so whether it was executed or not. *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150; *American Tobacco Co.* v. *United States,* 328 U. S. 781, 810. But this agreement by MacGregor to sell at fixed prices was no mere token, for the trial court found that on July 11, 1940, Westinghouse

only for judgment for refund of the royalties alleged to have been inadvertently paid, but also for damages on account of the illegal restraint imposed upon him by the agreement.

The state trial court declined to consider the validity of the patent, holding that it was presumed to be valid, and that MacGregor as a licensee had no right to challenge it. Assuming the patent and all the claims in it to be valid on this theory, the state court found the claims broad enough in scope to cover all the solders manufactured and sold by MacGregor. The trial court did not give a like presumption to the validity of the patents issued to MacGregor, but held that the solders covered by those patents infringed the presumptively valid patents of Westinghouse.[4] The state supreme court affirmed. 350 Pa. 333, 38 A. 2d 244. It agreed with the trial court that MacGregor was estopped to attack the validity of Westinghouse's patent. It recognized that there could be no estoppel in the present case under our decision in *Sola Electric Co.* v. *Jefferson Electric Co.*, 317 U. S. 173, but for its interpretation of the *Sola* decision as applying only to suits in which the licensor

called MacGregor's attention to his obligation to observe user and distributor prices, and that on October 23, 1940, Westinghouse, through one of its attorneys, wrote MacGregor's attorney that "if MacGregor sells direct to the user, he should conform to the user prices established, and when he sells direct to the dealer, he should conform to the dealer prices established." The oral testimony of Westinghouse's representatives construed the contract as requiring Mac-Gregor to maintain the prices. Moreover, the record before us shows that MacGregor positively testified that he had maintained the Westinghouse prices on the copper-phosphorus combination because he considered himself bound to do so under the license contract.

[4] Since the case is to be remanded for trial of the validity of the patent, we find it unnecessary to consider the propriety in any event of indulging a presumption of validity in favor of Westinghouse's patent without giving a presumption of a patentable difference to those of MacGregor. See *Miller* v. *Eagle Manufacturing Co.*, 151 U. S. 186, 208.

sought affirmative relief to enforce compliance with the price-fixing provision. Since no such relief was asked in this case, the state supreme court felt that there was no existing controversy which involved the price-fixing provision—that the questions of their effect and validity were "moot." Thus it assumed, as did the petitioner in *Katzinger Co.* v. *Chicago Metallic Mfg. Co., supra,* that a royalty agreement was severable from price-fixing covenants.

For the reasons stated in today's *Katzinger* opinion we hold that the covenant to pay royalties was not severable from the covenant to sell at fixed prices. Since Mac-Gregor invoked federal law to sustain his challenge to the validity of the patent, the alleged misuse of the patent, and the price-fixing covenant, his contentions raised federal questions not governed by state estoppel or contract severability rules. *Sola Electric Co.* v. *Jefferson Electric Co., supra,* 176–177; *Scott Paper Co.* v. *Marcalus Co.,* 326 U. S. 249. Accordingly, we hold as a matter of federal law that the state supreme court was wrong in affirming the judgment in this cause on the ground that the licensee, MacGregor, was estopped to offer proof of his allegation of invalidity. This error will require, as the state court anticipated, that the cause be remanded for a new trial to determine the validity of Westinghouse's patent. For we do not think that the present state of this record justifies acceptance of MacGregor's contention that we should now pass on validity of the patent. If it be determined on remand that the patent is invalid, there is no question but that, as MacGregor contends, the price-fixing agreement violates the anti-trust laws. *Katzinger Co.* v. *Chicago Metallic Co., supra; Sola Electric Co.* v. *Jefferson Electric Co., supra,* at 175; *Scott Paper Co.* v. *Marcalus Co., supra.*

But there are alternative federal questions raised here by MacGregor upon which decision might turn even

though Westinghouse's patent be held valid. MacGregor pleaded that the price-fixing agreement so effectively wiped out all competition to Westinghouse in the manufacture and sale of these solders that the whole license contract should be held illegal as a violation of the Sherman and Clayton Acts. MacGregor also contended that the license contract should be held unenforceable in the courts on the ground that Westinghouse had attempted to use it to extend the patent's scope beyond its lawful coverage. But since the cause must again be tried in the state court we shall not pass on either of these contentions at this time.

The judgment is reversed and the case remanded to the Supreme Court of Pennsylvania for proceedings not inconsistent with this opinion.

*Reversed and remanded.*

Mr. Justice Frankfurter, with whom concur Mr. Justice Reed, Mr. Justice Jackson and Mr. Justice Burton, dissenting.*

The Court deems the issues in these cases to be controlled by our decision in *Sola Electric Co.* v. *Jefferson Co.,* 317 U. S. 173. Such is not my understanding of the *Sola* decision. These cases cannot be properly decided, I believe, without consideration of one of the oldest doctrines of the patent law, namely, that a licensee cannot challenge the validity of the patent though everyone else may.

(1) Ninety years ago this Court unanimously announced the doctrine that a licensee under a patent is estopped from challenging the validity of that patent. *Kinsman* v. *Parkhurst,* 18 How. 289. The case may perhaps be explained, or even explained away. But the rule it expressed had become so much part of our law that fifty

---

*[This is also a dissent from the decision in *Katzinger Co.* v. *Chicago Metallic Co., ante,* p. 394.]

years later the Court deemed it unnecessary to discuss it and unanimously applied it even against the United States as licensee. *United States* v. *Harvey Steel Co.,* 196 U. S. 310. It is significant that the licensee in that case, while vigorously contesting its liability upon the particular facts, conceded that the doctrine of estoppel was law "as a general proposition."

(2) Before those cases and since, in all English-speaking jurisdictions, in the courts of England, of the Dominions and of the various States, as well as in the lower federal courts, where most patent litigation originates and stops, a weighty body of cases affirmed and applied that doctrine with rare unanimity.[1] This Court has never questioned the rule.[2] The principle has withstood judicial scrutiny for nearly a century.

(3) Nor has the operation of the rule revealed inroads upon the public interest so as to stir efforts for its abrogation or restriction by Congress. Patent policy has been frequently reconsidered, and some rules formulated by courts were eliminated or modified. Yet in none of the four major patent statutes nor in any of the other numerous amendatory enactments was attempt made to abolish or limit estoppel in favor of the licensor.[3] The Patent

---

[1] The early cases are collected in 14 Ann. Cas. 1184. Note also the unanimity among the authors of treatises. Amdur, Patent Law and Practice 598; Ellis, Patent Assignments and Licenses § 692 *et seq.;* 2 Frost, Patent Law and Practice 201; Moulton, Patents 244; Rivise and Caesar, Patentability and Validity § 10; 2 Robinson, Patents § 820; 2 Walker, Patents (Deller's ed.) § 383. And see the cases cited, especially in Walker, Patents, *supra.*

[2] *Cf. Eureka Company* v. *Bailey Company,* 11 Wall. 488, 492; *Eclipse Bicycle Company* v. *Farrow,* 199 U. S. 581, 587.

[3] See Patent Act of 1790, 1 Stat. 109; Patent Act of 1793, 1 Stat. 318; Patent Act of 1836, 5 Stat. 117; Patent Act of 1870, 16 Stat. 198. See also the subsequent minor enactments, summarized, J. Pat. Off. Soc., July 1936, pp. 103–22. And see 1 Walker, Patents (Deller's ed.) Appendix.

Office, charged by Congress with supervision of the patent system and the source of many suggestions enacted into law, has never included among its proposals recommendation to alter that doctrine.

(4) Not until 1942, apparently, was legislative correction invoked, and even then only partially. Several bills were introduced to permit contest of the validity of a patent in anti-trust suits. See S. 2730, Aug. 20, 1942; H. R. 7713, Oct. 15, 1942; H. R. 109, Jan. 6, 1943; H. R. 1371, Jan. 20, 1943. Only in the latest bills to be introduced is it proposed that "In any proceeding involving a violation of the antitrust laws or involving a patent or any interest therein, a party shall be entitled to show the invalidity or the limited scope of any patent or patent rights involved." H. R. 3874, Dec. 18, 1943; H. R. 97, Jan. 3, 1945; H. R. 3462, June 13, 1945; S. 2482, July 26, 1946. Not one of these bills has yet reached the floor of Congress.

(5) If ever a doctrine has established itself as part of our law to be respected by the judiciary, this is it. If it is to be changed, Congress is there to change it. Perhaps Congress will see fit to reexamine the doctrine in all its ramifications in the light of its history and the experience under it, and with due regard to all factors relevant to our patent system. We cannot do that. We can only adhere to the doctrine or overrule it. Until Congress does undo a principle so embedded in our law, we should leave it where we find it.

(6) But, in any event, if we are to wipe out so settled a phase of our law it should be done explicitly, not cryptically. In my judgment the *Sola* decision does not give adequate support for the Court's opinion. The cases before us necessarily involve the estoppel doctrine and cannot be disposed of without appearing to overrule a settled course of decision.

(7) No doubt the *Sola* case, like these two, arose out of a claim for royalties under a patent license. But that there was a claim for royalties was hardly mentioned in the Court's opinion in the *Sola* case. The sole issue to which our attention was directed was a prayer that the licensee be enjoined from breach of his promise to abide by the prices fixed by the licensor for the sale of articles manufactured under the patent. Ever since the decision in *Dr. Miles Medical Co.* v. *Park & Sons Co.,* 220 U. S. 373, this Court, as a matter of judicial policy reflected in legislation, has denied enforcement of agreements not to sell goods below a fixed price. And so this Court has been on the alert not to allow an exception to what is a Congressional as well as a judicial policy unless the basis for it is clean and clear.

The precise issue which we decided in the *Sola* case is not a matter for inference or conjecture. It was explicitly defined and delimited. "The question for our decision," the late Chief Justice wrote, "is whether a patent licensee, by virtue of his license agreement, is estopped to challenge a price-fixing clause in the agreement by showing that the patent is invalid, and that the price restriction is accordingly unlawful because not protected by the patent monopoly." 317 U. S. at 173. That was the issue in the *Sola* case. It was not whether a licensee may challenge the validity of a patent when sued for royalties. It was not whether a provision for price-fixing undermined rights under estoppel against a licensee. It was whether the licensor could show the special dispensation pertaining to the holder of a valid patent, which entitles him to fix the price of a commodity manufactured under his patent, although such a pricing agreement would be unenforceable in the generality of cases. What was sought and what was denied in *Sola* was the active benefit of a price-fixing clause.

(8) In the cases before us price-fixing is not in issue.[4] We are not asked to allow the licensor to have the benefit of a practice available only under a valid patent. To grant relief here will not, unlike the *Sola* case, approve a

[4] "In the instant case the court has not been requested either directly or indirectly to require MacGregor to maintain Westinghouse prices. By his own testimony he has not maintained them. The price-fixing clause is not in issue. It is raised merely as a defense to a suit for accounting and payment of accrued royalties." Discussion of findings by trial court in the *MacGregor* case.

As to the *Katzinger* case the District Court opinion found that "no price fixing by the respondent has been proved by the petitioner. . . . At no time did the respondent attempt to carry it out and the respondent was at all times willing to have same removed from the contract." Further, a specific finding of fact was that "Respondent was always willing to eliminate the price fixing provisions of the license agreement, and these provisions terminated *ipso facto* upon termination of the license by petitioner." It was on the basis of the facts so found by the District Court that the Circuit Court of Appeals held, when the estoppel issue was before it, that the mere presence of a price-fixing clause in the licensing agreement, whatever its setting and however inoperative, precluded estoppel against the licensee. 139 F. 2d 291. With the estoppel issue thus eliminated, the case was returned to the District Court to pass on the validity of the patent. Inasmuch as the Circuit Court of Appeals had found that the District Court had erred in its decree enforcing estoppel, the previous findings regarding estoppel became irrelevant and fell with the reversed decree. These findings, however, did not cease to be part of the record before the Circuit Court of Appeals on the first appeal. It is that decision, with the record on which it is based, that is now before us. If the Circuit Court of Appeals had enforced estoppel, the decree of the District Court and the findings on which it is based would not have been vacated. The findings that were before the Circuit Court of Appeals on the first appeal are now before us on review of that court's decision.

The license agreement provided for royalties based on a percentage of the net sales. The amount of the net sales was not fixed by agreement except insofar as certain scheduled articles called for a minimum price. The record does not show the prices at which the sales were made. Not only that, the claim of the licensee was that the articles for which royalties were claimed were outside the license. Plainly

practice *prima facie* in restraint of trade. What we here have to decide is whether we shall allow the licensee to repudiate an agreement for the payment of money made in an arm's length transaction. For nearly a hundred years this Court has uniformly answered that question by using the legal shorthand of estoppel.

(9) But if all the cases which have recognized and applied the doctrine of estoppel have been reduced, as apparently they have been, to derelicts, they should not be allowed to remain as obstructions on the stream of law. And not merely out of regard for the proper administration of law. The matter has practical consequences for all whose concern is patents. It is not questioned that a price-fixing clause in a license to manufacture under a valid patent falls outside the interdict of the anti-trust acts. *Bement* v. *National Harrow Co.,* 186 U. S. 70.[5] The power to fix the price of patented articles is part of the patent grant. It is a mode of maintaining the integrity of a patent and as such is sanctioned by public policy. All that the *Sola* case held, and the only thing it held, was that a valid patent is indispensable to this right to fix prices.

But whether an inventor has a valid patent is a matter of increasing uncertainty. Hitherto, under the estoppel

such articles were not included on the minimum price schedule and could not have been sold according to the scheduled price list. The claim for royalties, therefore, was not a claim for royalties at fixed prices.

[5] Upon full consideration the principle of the *Bement* case was reaffirmed and applied in *United States* v. *General Electric Co.,* 272 U. S. 476. The latter case in turn was cited with approval in *Carbice Corp.* v. *American Patents Corp.,* 283 U. S. 27, 31. It is relevant to note that Mr. Justice Brandeis joined in the *General Electric* opinion and himself wrote the *Carbice* opinion. No member of this Court has been more resourcefully alert to protect the public interest from undue extension of the patent monopoly while at the same time observing the rights which Congress has seen fit to confer by the patent grant.

doctrine, a patentee could be assured that he would not have to litigate the validity of his patent with those to whom he grants license rights under it. Under the present decision, he cannot have this assurance of freedom from litigation if, under reasonable belief that he has a valid patent, he inserts a price-fixing clause in the license, even though afterwards he merely asks for royalties.

What matters is not merely that a patentee must now choose between two safeguards of his patent grant. In the *Sola* case the licensor asked for the enforcement of a pricing agreement. Here the price-fixing agreement is not brought into question and the patentee stands on his estoppel. This important difference is disregarded, the *Sola* case is deemed controlling, and the estoppel is left to fend for itself as a legal stray. By its silence, as by its reasoning in applying the *Sola* case, the decision will engender natural doubts as to the continuing validity of the estoppel doctrine even in those cases where no pricing agreement had ever existed. The result is that all future arrangements between licensor and licensee are overhung by a cloud of doubt as to what one who believes that he holds a valid patent should do in granting licenses under it.

If he insists on a price agreement to help maintain the integrity of his business, he runs the risk of losing his royalties since the mere existence of the price-fixing clause (which is all we have here) may find him entirely in the cold if it should turn out that the patent is not sustained. So long as the estoppel doctrine as such stands unrejected, the patentee may, therefore, prefer to forego price-fixing and be satisfied with the bird in the hand in reliance on estoppel. But the upshot of the present decision is that the Court creates an unfair uncertainty as to the continued vitality of the historic estoppel doctrine. The result is that the patentee who foregoes his right to maintain prices in order to make certain that he can at

least collect his patent royalties without the cost and uncertainty of litigation, may find himself caught in the optimism of his belief as to the vitality of the estoppel doctrine unembarrassed by any price-fixing provision. For he may have given up what he might otherwise assert as a patentee to make sure that he can in any event have what estoppel would give him. It would seem fair to pronounce now that the doctrine of estoppel has or has not survived so that those who deem themselves holders of patent rights might not suffer because they assumed that the Court would preserve that which by no intimation it purports to jettison.

(10) The problem before the Court can be treated as though it was the same as that in the *Sola* case only if a distinction with a difference makes no difference. It is one thing to refuse to enforce a contract restraining trade by price-fixing unless positive justification is shown in the form of a valid patent. It is quite another to use the excuse of an inoperative price-fixing clause to allow a licensee to escape his otherwise valid promise to pay royalties.[6] Nowhere in the *Sola* case did the Court intimate that the decision rested upon the importance to the public economy of allowing challenge to the validity of a patent by those particular members of the public who in a fair bargain had agreed not to do so. In fact, the doctrine of estoppel, flowing from *Kinsman* v. *Parkhurst* and applied in *United States* v. *Harvey Steel Co.*, was explicitly noted

---

[6] The considerations that determine the granting of a license on payment of royalties are distinct from those that underlie an additional clause for price-fixing. They are not interdependent in fact and were not so treated by the parties; no artificial notion regarding consideration requires that they be treated as interdependent. On lesser considerations of policy than have guided the course of patent law, this Court has refused to treat separate provisions of a contract as integrated. See *Philadelphia, Wilmington & Baltimore Railroad Co.* v. *Howard,* 13 How. 307, 339; *Pollak* v. *Brush Electric Association,* 128 U. S. 446, 455.

only to be put to one side because "here a different question is presented." 317 U. S. at 175. It was again put aside in *Altvater* v. *Freeman,* 319 U. S. 359, 364.[7] The question which those cases did not have to meet should now be met otherwise than by disregard. The Court's essential reasoning would apply equally where the license never attempted to fix prices. If a doctrine that was vital law for more than ninety years will be found to have now been deprived of life, we ought at least to give it decent public burial.

---

[7] *Scott Paper Co.* v. *Marcalus Co.,* 326 U. S. 249, went on the ground that an earlier expired patent had put the device in question into the public domain.