339 U.S. 827
 70 S.Ct. 894
 94 L.Ed. 1312
 AUTOMATIC RADIO MFG. CO., Inc.,
v.
HAZELTINE RESEARCH, Inc.
 No. 455.
 Argued April 5, 1950.
 Decided June 5, 1950.
 Rehearing Denied Oct. 9, 1950.
 
 See 71 S.Ct. 13.
 Mr. Floyd H. Crews, New York City, for petitioner.
 Messrs. Laurence B. Dodds, New York City, Philip F. LaFollette, Madison, Wis., for respondent.
 [Argument of Counsel from page 828 intentionally omitted]
 Mr. Justice MINTON delivered the opinion of the Court.
 
 
 1
 This is a suit by respondent Hazeltine Research, Inc., as assignee of the licensor's interest in a nonexclusive patent license agreement covering a group of 570 patents and 200 applications, against petitioner Automatic Radio Manufacturing Company, Inc., the licensee, to recover royalties. The patents and applications are related to the manufacture of radio broadcasting apparatus. Respondent and its corporate affiliate and predecessor have for some twenty years been engaged in research, development, engineering design and testing and consulting services in the radio field. Respondent derives income from the licensing of its patents, its policy being to license any and all responsible manufacturers of radio apparatus at a royalty rate which for many years has been approximately one percent. Petitioner manufactures radio apparatus, particularly radio broadcasting receivers.
 
 
 2
 The license agreement in issue, which appears to be a standard Hazeltine license, was entered into by the parties in September 1942, for a term of ten years. By its terms petitioner acquired permission to use, in the manufacture of its 'home' products, any or all of the patents which respondent held or to which it might acquire rights. Petitioner was not, however, obligated to use respondent's patents in the manufacture of its products. For this license, petitioner agreed to pay respondent's assignor royalties based upon a small percentage of petitioner's selling price of complete radio broadcasting receivers, and in any event a minimum of $10,000 per year. It further agreed to keep a record of its sales and to make monthly reports thereof.
 
 
 3
 This suit was brought to recover the minimum royalty due for the year ending August 31, 1946, for an accounting of other sums due, and for other relief. Petitioner answered and both parties filed motions for summary judgment and affidavits in support of the motions. The District Court found the case to be one appropriate for summary procedure under Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A., and sustained the motion of respondent for judgment. The validity of the license agreement was upheld against various charges of misuse of the patents, and judgment was entered for the recovery of royalties and an accounting, and for a permanent injunction restraining petitioner from failing to pay royalties, to keep records, and to render reports during the life of the agreement. D.C., 77 F.Supp. 493. The Court of Appeals affirmed, one judge dissenting, 1 Cir., 176 F.2d 799 (and we granted certiorari, 338 U.S. 942, 70 S.Ct. 428, in order to consider important questions concerning patent misuse and estoppel to challenge the validity of licensed patents.
 
 
 4
 The questions for determination are whether an misuse of patents has been shown, and whether petitioner may contest the validity of the licensed patents, in order to avoid its obligation to pay royalties under the agreement.
 
 
 5
 First. It is insisted that the license agreement cannot be enforced because it is a misuse of patents to require the licensee to pay royalties based on its sales, even though none of the patents are used. Petitioner directs our attention to the 'Tie-in' cases. These cases have condemned schemes requiring the purchase of unpatented goods for use with patented apparatus or processes,[1] prohibiting production or sale of competing goods,[2] and conditioning the granting of a license under one patent upon the acceptance of another and different license.[3] Petitioner apparently concedes that these cases do not, on their facts, control the instant situation. It is obvious that they do not. There is present here no requirement for the purchase of any goods. Hazeltine does not even manufacture or sell goods; it is engaged solely in research activities. Nor is there any prohibition as to the licensee's manufacture or sale of any type of apparatus. The fact that the license agreement covers only 'home' apparatus does not mean that the licensee is prohibited from manufacturing or selling other apparatus. And finally, there is no conditioning of the license grant upon the acceptance of another and different license. We are aware that petitioner asserted in its countermotion for summary judgment in the District Court that Hazeltine refused to grant a license under any one or more of its patents to anyone who refused to take a license under all. This averment was elaborated in the affidavit of petitioner's attorney in support of the motion. The point was not pressed in the Court of Appeals or here. In any event there is nothing available in the record to support the averment, since the affidavit in support thereof was made upon information and belief and the relevant portion, at least, does not comply with Rule 56(e) of the Federal Rules of Civil Procedure.[4]
 
 
 6
 But petitioner urges that this case 'is identical in principle' with the 'Tie-in' cases. It is contended that the licensing provision requiring royalty payments of a percentage of the sales of the licensee's products constitutes a misuse of patents because it ties in a payment on unpatented goods. Particular reliance is placed on language from United States v. U.S. Gypsum, 333 U.S. 364, 389, 400, 68 S.Ct. 525, 539, 544, 92 L.Ed. 746.[5] That case was a prosecution under the Sherman Act, 15 U.S.C.A. § 1 et seq., for an alleged conspiracy of Gypsum and its licensees to extend the monopoly of certain patents and to eliminate competition by fixing prices on patented and unpatented gypsum board. The license provisions based royalties on all sales of gypsum board, both patented and unpatented. It was held that the license provisions, together with evidence of an understanding that only patented board would be sold, showed a conspiracy to restrict the production of unpatented products which was an invalid extension of the area of the patent monopoly. 333 U.S. at page 397, 68 S.Ct. at page 543. There is no indication here of conspiracy to restrict production of unpatented or any goods to effectuate a monopoly, and thus the Gypsum case does not aid petitioner. That which is condemned as against public policy by the 'Tie-in' cases is the extension of the monopoly of the patent to create another monopoly or restraint of competition—a restraint not countenanced by the patent grant. See, e.g., Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 665—666, 64 S.Ct. 268, 271, 88 L.Ed. 376; Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 778, 62 S.Ct. 402, 86 L.Ed. 363; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 456, 60 S.Ct. 618, 625, 84 L.Ed. 852. The principle of those cases cannot be contorted to circumscribe the instant situation. This royalty provision does not create another monopoly; it creates no restraint of competition beyond the legitimate grant of the patent. The right to a patent includes the right to market the use of the patent at a reasonable return. See 46 Stat. 376, 35 U.S.C. § 40, 35 U.S.C.A. § 40; Hartford-Empire Co. v. United States, 323 U.S. 386, 417, 65 S.Ct. 373, 388, 89 L.Ed. 322; Id., 324 U.S. 570, 574, 65 S.Ct. 815, 818, 89 L.Ed. 1198.
 
 
 7
 The licensing agreement in issue was characterized by the District Court as essentially a grant by Hazeltine to petitioner of a privilege to use any patent or future development of Hazeltine in consideration of the payment of royalties. Payment for the privilege is required regardless of use of the patents.[6] The royalty provision of the licensing agreement was sustained by the District Court and the Court of Appeals on the theory that it was a convenient mode of operation designed by the parties to avoid the necessity of determining whether each type of petitioner's product embodies any of the numerous Hazeltine patents. D.C., 77 F.Supp. at 496. The Court of Appeals reasoned that since it would not be unlawful to agree to pay a fixed sum for the privilege to use patents, it was not unlawful to provide a variable consideration measured by a percentage of the licensee's sales for the same privilege. 1 Cir., 176 F.2d at page 804. Numerous District Courts which have had occasion to pass on the question have reached the same result on similar grounds,[7] and we are of like opinion.
 
 
 8
 The mere accumulation of patents, no matter how many, is not in and of itself illegal. See Transparent-Wrap Machine Corp. v. Stokes & Smith Co., 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563. And this record simply does not support incendiary, yet vague, charges that respondent uses its accumulation of patents 'for the exaction of tribute' and collects royalties 'by means of the overpowering threat of disastrous litigation.' We cannot say that payment of royalties according to an agreed percentage of the licensee's sales is unreasonable. Sound business judgment could indicate that such payment represents the most convenient method of fixing the business value of the privileges granted by the licensing agreement. We are not unmindful that convenience cannot justify an extension of the monopoly of the patent. See, e.g., Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 666, 64 S.Ct. 268, 271, 88 L.Ed. 376; B.B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 408, 86 L.Ed. 367. But as we have already indicated, there is in this royalty provision no inherent extension of the monopoly of the patent. Petitioner cannot complain because it must pay royalties whether it uses Hazeltine patents or not. What it acquired by the agreement into which it entered was the privilege to use any or all of the patents and developments as it desired to use them. If it chooses to use none of them, it has nevertheless contracted to pay for the privilege of using existing patents plus any developments resulting from respondent's continuous research. We hold that in licensing the use of patents to one engaged in a related enterprise, it is not per se a misuse of patents to measure the consideration by a percentage of the licensee's sales.
 
 
 9
 Second. It is next contended by petitioner that the license agreement is unenforceable because it contained a provision requiring the following restrictive notice to be attached to apparatus manufactured by petitioner under the agreement: "Licensed by Hazeltine Corporation only for use in homes, for educational purposes, and for private, non-commercial use, under one or more of the following patents and under pending applications:' followed by the word 'Patent' and the numbers of the patents which are, in the opinion of Licensor, involved in apparatus of the types licensed hereunder manufactured by one or more licensees of Licensor.'
 
 
 10
 Respondent did not seek to have this provision of the agreement enforced, and the decree of the District Court does not enforce it. It may well have been a dead letter from the beginning, as indicated by the fact that, as petitioner averred in its answer, it has never observed this provision of the agreement. Thus it is doubtful that the legality of this provision could be contested, even assuming that the issue was properly raised, which respondent disputes. In any event, it is clear that any issue with respect to this provision of the agreement is moot. An affidavit of the president of respondent corporation advises us of certain letters which were sent by respondent in September 1945, to each of its licensees, including petitioner. These letters authorized the discontinuance of the restrictive notice provision and the substitution of the marking 'This apparatus is licensed under the United States patent rights of Hazeltine Corporation.' It is further averred that this form of notice is all that respondent has required of its licensees since September 1945. Since this provision of the agreement was made for the benefit of respondent, it could voluntarily waive the provision. Westinghouse Electric Corp. v. Bulldog Electric Products Co., 4 Cir., 179 F.2d 139, 145, 146. Thus the question of the legality of the original restrictive notice provision is not before us. Cf. Standard Oil Co. (Indiana) v. United States, 283 U.S. 163, 181—182, 51 S.Ct. 421, 427, 428, 75 L.Ed. 926.
 
 
 11
 Third. Finally, it is contended that notwithstanding the licensing agreement, petitioner-licensee may contest the validity of the patents it is charged with using. The general rule is that the licensee under a patent license agreement may not challenge the validity of the licensed patent in a suit for royalties due under the contract. United States v. Harvey Steel Co., 196 U.S. 310, 25 S.Ct. 240, 49 L.Ed. 492. The general principle of the invalidity of price-fixing agreements may be invoked by the licensee of what purport to be valid patents to show in a suit for royalties that the patents are invalid. Katzinger Co. v. Chicago Metallic Mfg. Co., 329 U.S. 394, 67 S.Ct. 416, 91 L.Ed. 374; MacGregor v. Westinghouse Elec. & Mfg. Co., 329 U.S. 402, 67 S.Ct. 421, 424, 91 L.Ed. 380. There is no showing that the licensing agreement here or the practices under it were a misuse of patents or contrary to public policy. This limited license for 'home' use production contains neither an express nor implied agreement to refrain from production for 'commercial' or any other use as part consideration for the license grant. The Katzinger and MacGregor cases are inapplicable. The general rule applies, and petitioner may not, in this suit, challenge the validity of the licensed patents.
 
 
 12
 The judgment of the Court of Appeals is affirmed.
 
 
 13
 Affirmed.
 
 
 14
 Mr. Justice JACKSON took no part in the consideration or decision of this case.
 
 
 15
 Mr. Justice DOUGLAS, with whom Mr. Justice BLACK concurs, dissenting.
 
 
 16
 We are, I think, inclined to forget that the power of Congress to grant patents is circumscribed by the Constitution. The patent power, of all legislative powers, is indeed the only one whose purpose is defind. Article I, § 8 describes the power as one 'To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.' This statement of policy limits the power itself.
 
 
 17
 The Court in its long history has at times been more alive to that policy than at other times. During the last three decades it has been as devoted to it (if not more so) than at any time in its history. I think that was due in large measure to the influence of Mr. Justice Brandeis and Chief Justice Stone. They were alert to the danger that business—growing bigger and bigger each decade would fasten its hold more tightly on the economy through the cheap spawning of patents and would use one monopoly to beget another through the leverage of key patents. They followed in the early tradition of those who read the Constitution to mean that the public interest in patents comes first, reward to the inventor second.[1]
 
 
 18
 First. Mr. Justice Brandeis and Chief Justice Stone did not fashion but they made more secure one important rule designed to curb the use of patents. It is as follows: One who holds a patent on article A may not license the use of the patent on condition that B, an unpatented article, be bought.[2] Such a contract or agreement would be an extension of the grant of the patent contrary to a long line of decisions. See Motion Picture Patents Co. v. Universal Film Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A. 1917E, 1187, Ann.Cas.1918A, 959; Carbice Corp. of America v. American Patents Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; Morton Salt v. G.S. Suppiger, 314 U.S. 488, 491—492, 778, 62 S.Ct. 402, 404, 405, 86 L.Ed. 363; United States v. Masonite Corp., 316 U.S. 265, 277, 278, 62 S.Ct. 1070, 1077, 86 L.Ed. 1461; Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 666, 64 S.Ct. 268, 271, 88 L.Ed. 376; United States v. United States Gypsum Co., 333 U.S. 364, 389, 68 S.Ct. 525, 539, 92 L.Ed. 746. For it would sweep under the patent an article that is unpatented or unpatentable. Each patent owner would become his own patent office and, by reason of the leverage of the patent, obtain a larger monopoly of the market than the Constitution or statutes permit.[3]
 
 
 19
 That is what is done here. Hazeltine licensed Automatic Radio to use 570 patents and 200 patent applications. Of these Automatic used at most 10. Automatic Radio was obligated, however, to pay as royalty a percentage of its total sales in certain lines without regard to whether or not the products sold were patented or unpatented. The inevitable result is that the patentee received royalties on unpatented products as part of the price for the use of the patents.
 
 
 20
 The patent owner has therefore used the patents to bludgeon his way into a partnership with this licensee, collecting royalties on unpatented as well as patented articles.
 
 
 21
 A plainer extension of a patent by unlawful means would be hard to imagine.
 
 
 22
 Second. Chief Justice Stone wrote for the Court in Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165, holding that a licensee is not estopped to challenge a price-fixing clause by showing the patent is invalid. And see Katzinger Co. v. Chicago Metallic Mfg Co., 329 U.S. 394, 67 S.Ct. 416, 91 L.Ed. 374; MacGregor v. Westinghouse Co., 329 U.S. 402, 67 S.Ct. 421, 91 L.Ed. 380. He also wrote for the Court in Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47, holding the estoppel did not bar the assignor of a patent from defending a suit for infringement of the assigned patent on the ground that the alleged infringing device was that of a prior-art expired patent.[4]
 
 
 23
 These decisions put the protection of the public interest in free enterprise above reward to the patentee. The limitations which they made on the estoppel doctrine represented an almost complete cycle back to the salutary teaching of Pope Mfg. Co. v. Gormully, 144 U.S. 224, 234, 12 S.Ct. 632, 636, 36 L.Ed. 414, that, 'It is as important to the public that competition should not be repressed by worthless patents, as that the patentee of a really valuable invention should be protected in his monopoly.' To estop the licensee from attacking the validity of patents is to forget that 'It is the public interest which is dominant in the patent system. Mercoid Corp. v. Mid-Continent Investment Co., supra, 320 U.S. at page 665, 64 S.Ct. at page 271.
 
 
 24
 It is said that if the purpose was to enlarge the monopoly of the patent—for example, through price fixing—then estoppel would not bar the licensee from challenging the validity of the patents. But what worse enlargement of monopoly is there than the attachment of a patent to an unpatentable article? When we consider the constitutional standard, what greater public harm than that is there in the patent system? It is only right and just that the licensee be allowed to challenge the validity of the patents. A great pooling of patents is made; and whole industries are knit together in the fashion of the unholy alliances revealed in United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701, and United States v. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746. One who wants the use of one patent may have to take hundreds. The whole package may contain many patents that have been foisted on the public. No other person than the licensee will be interested enough to challenge them. He alone will be apt to see and understand the basis of their illegality.
 
 
 25
 The licensee protects the public interest in exposing invalid or expired patents and freeing the public of their toll. He should be allowed that privilege. He would beallowed it were the public interest considered the dominant one. Ridding the public of stale or specious patents is one way of serving the end of the progress of science.
 
 
 26
 We depart from a great tradition in this field (and see Graver Tank & Mfg. Co. v. Linde Air Products, 339 U.S. 605, 70 S.Ct. 854), when we affirm this judgment.
 
 
 
 [1]
 International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, Mercoid Corp. v. Minneapolis-Honeywell Regulator Co., 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396; Mercoid v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376; B.B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367; Morton Salt Co. v. G.S. Suppiger Co., 314 U.S. 488, 778, 62 S.Ct. 402, 86 L.Ed. 363; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; Leitch Manufacturing Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371; International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085; Carbice Corp. v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; United Shoe Machinery Corp. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708; Motion Picture Patents Co. v. Universal Film Manufacturing Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959.
 
 
 [2]
 United Shoe Machinery Corp. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708; National Lockwasher Co. v. Garrett Co., 3 Cir., 137 F.2d 255; Radio Corp. of Amer. v. Lord, 3 Cir., 28 F.2d 257.
 
 
 [3]
 United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. (Copyright 'Block-booking.')
 
 
 [4]
 'Form of Affidavits; Further Testimony. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. * * *' Fed.Rules Civ.Proc. 56(e).
 
 
 [5]
 '* * * the royalty was to be measured by a percentage of the value of all gypsum products, patented or unpatented * * *.' 333 U.S. at page 389, 68 S.Ct. at page 539. 'Patents grant no privilege to their owners of organizing the use of those patents to monopolize an industry through price control, through royalties for the patents drawn from patent-free industry products and through regulation of distribution.' 333 U.S. at page 400, 68 S.Ct. at page 544.
 
 
 [6]
 In this view of the contract we need not concern ourselves with the controversy between counsel as to whether the transcript shows a factual dispute over the use of non-use of Hazeltine patents by petitioner in its products.
 
 
 [7]
 Hazeltine Research v. Admiral Corp., D.C., 87 F.Supp. 72, 79; H-P-M Development Corp. v. Watson-Stillman Co., D.C., 71 F.Supp. 906, 912; American Optical Co. v. New Jersey Optical Co., D.C., 58 F.Supp. 601, 606; Ohio Citizens Trust Co. v. Air-Way Electric Appliance Corp., D.C., 56 F.Supp. 1010, 1012; Cf. Pyrene Mfg. Co. v. Urquhart, D.C., 69 F.Supp. 555, 560; International Carbonic Engineering Co. v. Natural Carbonic Products, D.C., 57 F.Supp. 248, 251—253, affirmed, 9 Cir., 158 F.2d 285. At least one state court has reached this result. Hazeltine Research v. DeWald Radio Corp., 194 Misc. 81, 84 N.Y.S.2d 597, 603.
 
 
 [1]
 See Mr. Justice Story in Pennock v. Dialogue, 2 Pet. 1, 7 L.Ed. 327; Mr. Justice Daniel in Kendall v. Winsor, 21 How. 322, 16 L.Ed. 165; Mr. Justice Campbell in Winans v. Denmead, 15 How. 330, 344, 14 L.Ed. 717 (dissenting opinion).
 
 
 [2]
 See Hamilton, Patents and Free Enterprice, T.N.E.C. Monograph No. 31, 76th Cong., 3d Sess., pp. 62—70.
 
 
 [3]
 Mr. Justice Brandeis speaking for the Court in Carbice Corp. of America v. American Patents Corp., supra, 283 U.S. at page 32, 51 S.Ct. at page 335, said, 'If a monopoly could be so expanded, the owner of a patent for a product might conceivably monopolize the commerce in a large part of unpatented materials used in its manufacture. The owner of a patent for a machine might thereby secure a partial monopoly on the unpatented supplies consumed in its operation. The owner of a patent for a process might secure a partial monopoly on the unpatented material employed in it. The owner of the patent in suit might conceivably secure a limited monopoly for the supplying not only of solid carbon diozide, but also of the ice cream and other foods, as well as the cartons in which they are shipped. The attempt to limit the licensee to the use of unpatented materials purchased from the licensor is comparable to the attempt of a patentee to fix the price at which the patented article may be resold.'
 
 
 [4]
 In this case Chief Justice Stone emphasized the public interest at stake in allowing the challenge to the patent, 326 U.S. at page 256, 66 S.Ct. at page 104: 'By the force of the patent laws not only is the invention of a patent dedicated to the public upon its expiration, but the public thereby becomes entitled to share in the good will which the patentee has built up in the patented article or product through the enjoyment of his patent monopoly.'