533 P.2d 700

**Phillip J. DATTILO, Appellant,**

**v.**

**TUCSON GENERAL HOSPITAL, a nonprofit corporation, Frank Stuart, Gordon Sweet, R. E. Dennis, H. L. Myers, Ken Wagner, T. P. McWilliams, Individually and as members of the Board of Trustees of Tucson General Hospital, and I. Y. Hallaq, T. B. Struse, R. W. Rente, and R. B. Kring, Appellees.**

**No. 2 CA–CIV 1672.**

Court of Appeals of Arizona,
Division 2.

April 8, 1975.

Rehearing Denied May 7, 1975.

Review Denied June 24, 1975.

Chandler, Tullar, Udall & Richmond, by Robert S. Tullar, Tucson, for appellant.

Merchant, Lohse & Bloom, by Ashby I. Lohse, Tucson, for appellees Tucson General & Members of Board of Trustees.

Bilby, Thompson, Shoenhair & Warnock, P. C., by Richard M. Bilby, Tucson, for appellees Hallaq, Struse, Rente and Kring.

## OPINION

HOWARD, Chief Judge.

This litigation arises out of a contract between appellee Tucson General Hospital and Drs. Hallaq and Struse whereby the said doctors were given the exclusive right to provide nuclear medicine services at the hospital. The position of Drs. Rente and Kring in this case will be divulged as the facts are disclosed.

Appellant, Dr. Dattilo, an internist, sued for damages on the theory that the appellees unlawfully combined to prevent him from practicing his specialty at Tucson General Hospital and that the exclusive contract constituted an unreasonable restraint of trade in violation of the common law and A.R.S. § 44–1401 et seq. (repealed Laws 1974, Ch. 26, § 7). The case was tried to a jury which returned a $40,000 verdict in appellant's favor, but only against the hospital. The trial court, after submission of legal memoranda and forms of judgment by the parties, construed the verdict as requiring a judgment in favor of all the appellees and entered judgment accordingly.

The material facts are not in dispute. There are immaterial facts which are in dispute and we will so indicate in our recitation of the facts.

Tucson General Hospital is the only osteopathic hospital in the City of Tucson. During the period of late 1968 and early 1969, the hospital was in dire need of internists since Dr. Dattilo was the only one available and he was not board-certified. In the search for a qualified internist, Dr. Myers contacted Dr. Hallaq who was then practicing outside the State of Arizona. Dr. Hallaq made it clear to Dr. Myers that he was only interested in coming to Tucson if he were given an exclusive contract for the nuclear medicine services at the hospital. During that period, Drs. Rente and Kring were the hospital radiologists, their contract with the hospital covering the field of nuclear medicine. These doctors had made several requests of the Board of Trustees to purchase equipment for a nuclear medicine department but no money was available on those occasions.

Dr. Myers informed the Board of Dr. Hallaq's interest and the condition he had imposed. At a meeting of the Board of Trustees on May 6, 1969, the Board adopted a resolution to enter into an agreement with Dr. Hallaq. On May 15, 1969, the chairman of the Board, Gordon Sweet, sent the following letter to Dr. Hallaq:

"The Board of Trustees agrees that, upon your arrival in Tucson, you will be in complete charge of the Nuclear Medicine area, and any other Physician working in that area will do so by your permission, and is to be responsbile to you, but, personnel requirements (employee) will be decided upon jointly with the Administrator. You will be solely responsible for the work done in that area."

There was a question as to whether Mr. Sweet's letter conformed to the resolution of the Board but in any event, as will be seen, the terms of the letter were ratified by the Board when it issued a written contract to Drs. Hallaq and Struse. Dr. Struse, a qualified doctor in the field of nuclear medicine, had contacted Dr. Hallaq when he learned that Hallaq was coming to Tucson and Struse's name was added to the contract.

During this period of time Dr. Dattilo was studying nuclear medicine under qualified medical doctors in the City of Tucson. There was a conflict in the evidence as to whether the Board members knew he was studying nuclear medicine. However, Dr. Dattilo had received a license from the Arizona Atomic Energy Commission on December 3, 1969 and had commenced administering doses of radioactive material to patients in Tucson General Hospital who were then transported to St. Mary's Hospital for nuclear medicine procedures. In April of 1970, the Board members, when they learned of this, instructed Dr. Dattilo to stop such practice because there was no malpractice coverage for this particular work and Dr. Dattilo had no privileges in this area.

During March and April of 1970, at numerous meetings of the Board, the question of finalizing the contract for the development and operation of a nuclear medicine laboratory, was discussed. In the meantime, Drs. Rente and Kring had agreed to void that part of their contract, which they interpreted as being an exclusive contract but which gave them the right to administer radioactive isotopes at the hospital.

Dr. Dattilo appeared on two separate occasions, April 7th and April 21, 1970, and, by letter dated April 13, 1970, submitted a proposal relative to the nuclear medicine department. His proposal was as follows:

"Complete responsibility for operating a department of Nuclear Medicine with interpretation of all tests performed for a fee of 30 percent of gross business after bad debts."

Finally, on April 28, 1970, the Board voted to grant to Drs. Hallaq and Struse an exclusive contract for a period of five years to develop and be responsible for the Department of Nuclear Medicine at Tucson General Hospital. There were two dissenting votes, one by a doctor who was a

close personal friend of Dr. Dattilo and another by a lawyer who had done legal work for Dr. Dattilo in 1969 and 1970.

Nuclear medicine emphasizes radioisotopes (radionuclides) in diagnosis and therapy. Under the exclusive contract given by Tucson General Hospital, nuclear medicine services had to be performed by Drs. Hallaq and Struse at Tucson General Hospital for a patient in Tucson General Hospital. The expensive and sophisticated equipment used to treat and diagnose patients in the nuclear medicine field was purchased by Tucson General Hospital. The department of nuclear medicine employed a technician who actually operated the equipment. The main work of Drs. Hallaq and Struse consisted of reading "scans" which are the tracings of radioactive material injected into the body. Although Drs. Hallaq and Struse had the exclusive contract for nuclear medicine, they were also qualified internists and had staff privileges as such.

Appellant contends that the Arizona antitrust statutes govern the contract in question, and if not, the contract constitutes a violation of the common law prohibitions against restraint of trade. Appellees contend that our statutes do not apply, citing Goldfarb v. Virginia State Bar, 497 F.2d 1 (4th Cir. 1974), cert. granted 419 U.S. 963, 95 S.Ct. 223, 42 L.Ed.2d 178 (1974), and Willis v. Santa Ana Community Hospital Ass'n., 58 Cal.2d 806, 376 P.2d 568, 26 Cal. Rptr. 640 (1962).

The *Goldfarb* case held, inter alia, that the State Bar of Virginia was exempted from the provisions of the Sherman Antitrust Act, 15 U.S.C. § 1, under the so-called "learned profession" exception to the Act. This exception is not contained in the Act but has evolved from the concept that the "learned professions" are not engaged in "trade or commerce". The viability of the "learned profession" exemption is in doubt. See, United States v. Oregon State Bar, 385 F.Supp. 507 (D.Or. 1974).

The *Willis* case involved an interpretation of the California Anti-trust statutes. California prohibited contracts in restraint of "trade or commerce" and provided treble damages for violations of the Act. A. R.S. § 44–1401 prior to its repeal in 1974, prohibited restraints of trade or commerce and restraints in the "full and free pursuit of any business authorized or permitted by law." It did not provide for treble damages.[1] The *Willis* court interpreted the California Act narrowly because of the allowance of treble damages and held that it did not apply to "learned professions". *Willis* did, however, hold that an action will lie at common law where a right to pursue a lawful business, calling, trade or occupation is intentionally interfered with by unlawful means or by means otherwise lawful where there is a lack of justification. Willis was followed in Blank v. Palo Alto-Stanford Hospital Center, 234 Cal. App.2d 377, 44 Cal.Rptr. 572 (1965).

We need not decide whether the subject contract is governed by our antitrust statutes or common law precepts since in either case, the rule of reason applies except for certain per se violations which are inapplicable here. The rule of reason in respect to the Sherman Anti-Trust Act was set forth in Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1910). Only those contracts or combinations which *unreasonably* restrain competition are precluded by the Act. The rule of reason established in respect to the Sherman Anti-trust Act applies in the construction of state antitrust laws. Milton v. Hudson Sales Corp., 152 Cal.App.2d 418, 313 P.2d 936 (1957). Under the common law, an agreement which confers an exclusive privilege, and by reason thereof excludes others, is not per se illegal. Blank v. Palo Alto-Stanford Hospital Center, supra. Justification under the common law is determined not by applying precise standards but by balancing, in light of all the circumstances, the relative importance to society and the parties of pro-

---

1. The new Act passed in 1974 provides for treble damages.

tecting the activities interfered with on one hand, and permitting the interference on the other. Willis v. Santa Ana Community Hospital Ass'n., supra.

The use of the exclusive contract in providing certain medical services has been upheld by courts which have ruled on the subject. In Blank v. Palo Alto-Stanford Hospital Center, supra, the court held that the exclusive contract method of operating the Palo Alto diagnostic x-ray department was a reasonable and proper method of operating the department. In Benell v. City of Virginia, 258 Minn. 559, 104 N.W.2d 633 (1960), the court held that a closed staff in the radiology department was not arbitrary or unreasonable but in furtherance of the hospital's obligation to operate and administer the hospital efficiently and economically. In Letsch v. Northern San Diego County Hospital Dist., 246 Cal.App.2d 673, 55 Cal.Rptr. 118 (1966) the court held that a closed staff method of operating hospital radiology department was reasonable and lawful. In Adler v. Montefiore Hospital Ass'n., 453 Pa. 60, 311 A.2d 634 (1973), cert. denied 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974), the court held lawful a close staff regulation in the cardiology laboratory. Appellant offers no authority contra to the foregoing cases. Instead, he maintains these cases are inapposite for two reasons: First, the cited cases deal with medical doctors who can practice in other hospitals whereas Dr. Dattilo can only practice in an osteopathic hospital and there is only one in Tucson; second, his exclusion from the practice of nuclear medicine at Tucson General Hospital has placed him at an economic disadvantage with Drs. Hallaq and Struse since they are also permitted to practice as internists in addition to the practice of nuclear medicine.

■ Appellant's contentions are without merit. It must be stressed that Dr. Dattilo has staff privileges at Tucson General Hospital as an internist and is not forbidden from practicing as such. Drs. Hallaq and Struse, at the time of trial, were allowed to practice as internists in addition to running a nuclear medicine department. Dr. Dattilo claims that this places him at an unfair economic disadvantage because it is only natural that doctors who have their patients referred to the nuclear medicine department for diagnosis and treatment will refer their patients to Drs. Hallaq and Struse if the scans indicate that an internist is needed. To prove this point, Dr. Dattilo called as witnesses thirteen osteopathic physicians who have staff privileges at Tucson General Hospital. All but three of them stated that the fact that Drs. Hallaq or Struse read the scan would not necessarily affect their decision as to referral if an internist were required. Most of these doctors stated that they referred their cases on the basis of the personality of the patient.

Moreover, both Dr. Dattilo and his wife testified that after the arrival of Drs. Hallaq and Struse at Tucson General Hospital the gross income from Dr. Dattilo's practice was on the increase until this lawsuit was filed. Since the lawsuit some doctors who had formerly referred patients to him ceased doing so.

On the issue of reasonableness and justification the evidence is all one-sided. Michael J. Harris, administrator of Tucson General Hospital stated that it was a common practice in all hospitals to give exclusive contracts in pathology, radiology and nuclear medicine. He testified that such contracts were needed for control and standardization of procedure and effective, efficient operation of the department; that they give the Board of Trustees great ability to monitor the departments to insure that the standard is being maintained because of the more-limited number of people actually participating; better patient care is achieved because of better scheduling and higher quality of results; they operate more economically; they provide consistency of training of technicians; allow doctors to keep up with current cases in the field; and create a pool of medical knowledge available to all members of the staff

to utilize. He further testified that such exclusive contracts do not interfere with the patient selecting his own doctor.

Dr. Schyler Hilts, called as a witness for appellant, had the exclusive contract for nuclear medicine at Tucson Medical Center. He testified that when nuclear medicine was first used at Tucson Medical Center in 1959, he performed some diagnostic tests and also practiced as a full-time internist. He later went to the administrator, told him that it was requiring too much time, and made arrangements for receiving part of the gross income from nuclear medicine. It was not until a later time that he devoted his full-time practice to nuclear medicine. He stated that it is usual for a department such as nuclear medicine to start out on a part-time basis and develop into a full-time operation. He further testified that such exclusive contracts give better patient care and control.

Dr. Rente, called for cross-examination in appellant's case in chief, stated that the need for control in radiology, pathology and nuclear medicine is very great since adequate patient care depends upon the hospital having control over the use of the equipment and the administration of the exams. With reference to the need for centralized control, he stated there was no difference between radiology, pathology and nuclear medicine and that it was a universal practice to have exclusive contracts in nuclear medicine.

Dr. William S. Walters, Chairman of Pathology at Tucson General Hospital, testified that exclusive contracts were needed for such medical services as pathology and nuclear medicine since one person is responsible, thus insuring control and standardization of procedures which benefit the patient. He also stated that St. Joseph's Hospital in Tucson and Phoenix General Hospital in Phoenix have exclusive contracts for nuclear medicine.

Dr. Robert E. O'Mara, Director of Nuclear Medicine at the University of Arizona Hospital, testified that it is the most common practice throughout the country for a hospital to enter into an exclusive contract for the control and operation of the department of nuclear medicine and that such contracts are needed for uniform techniques and control. He also testified that very few nuclear medicine laboratories in a community-type hospital have ever been open except under the supervision of a part-time doctor.

Sister Chapala, administrator of St. Joseph's Hospital, Tucson, Arizona, testified that the nuclear medicine departments at St. Joseph's and St. Mary's Hospitals are under exclusive contracts.

None of the foregoing testimony was refuted. The only testimony offered by appellant which one could remotely characterize as a refutation of the foregoing testimony was that of Dr. Sawyer, appellant's close personal friend. He testified that it was always his personal feeling that there should be no exclusive contracts for radiology or pathology and he did not think there should be one for nuclear medicine. The lawyer who had been a member of the Board of Trustees in 1969 and 1970 and who voted against giving an exclusive contract to Drs. Hallaq and Struse testified that he had dissented because he could never see any reason for the exclusive contract. He admitted, however, that he did not check with any other hospitals to ascertain how they handled their nuclear medicine departments and also that at one point in time, when the Board was determining the length of the exclusive contract to Hallaq and Struse, he did vote for a one or two-year exclusive contract.

The testimony by the doctors and hospital administrators on the justification for the exclusive contract clearly demonstrates that this exclusive contract is necessary for proper patient care and the interference with Dr. Dattilo's right to use the nuclear medicine lab did not unreasonably interfere with his practice of medicine.

The appellees moved for a directed verdict at the close of all the evidence. Reasonable minds could not differ as to the reasonableness of and justification for the

exclusive contract. The trial court could have properly directed a verdict in appellees' favor.

For whatever reason the trial court entered judgment in favor of the appellees, it was correct.

Affirmed.

HATHAWAY and KRUCKER, JJ., concur.