659 P.2d 1271

**THREE PHOENIX COMPANY,**
Plaintiff-Appellant,

v.

**PACE INDUSTRIES, INC.,**
Defendant-Appellee.

No. 1 CA–CIV 4773.

Court of Appeals of Arizona,
Division 1, Department A.

March 10, 1981.
On Motion for Rehearing Nov. 19, 1981.
Review Granted Dec. 22, 1981.

Kenneth A. Winsberg, P.C. by Kenneth A. Winsberg, Cruse, Meadow & Firetag by Stephen T. Meadow, Phoenix, William W. Webb and Jonathan Rose, Tempe, for plaintiff-appellant.

Law Offices of Kenneth R. Reed, P.C. by Kenneth R. Reed, Brian K. Stanley, Phoenix, for defendant-appellee.

Robert K. Corbin, Atty. Gen. by Alison B. Swan, Chief Counsel, Antitrust Div., Phoenix, for State of Ariz., amicus curiae.

## OPINION

YALE McFATE, Judge (Retired).

The appellant, Three Phoenix Company, brought this litigation seeking injunctive and other relief based upon an alleged breach of covenants not to compete by the appellee, Pace Industries, Inc. Appellee moved to dismiss on the grounds that the covenants in question were unenforceable. The trial court, taking cognizance of affidavits submitted by appellant, considered the motion as one for summary judgment and granted judgment to appellee.

Since the trial court treated appellee's motion to dismiss as a motion for summary judgment, we must view the record in the light most favorable to appellant, and regard all uncontroverted facts set forth in support of or in opposition to the motion as true. *Watts v. Hogan,* 111 Ariz. 536, 534 P.2d 741 (1975).

Each of the parties acquired part of the business formerly conducted by the Equipment Division of Wabash Computer Corpo-ration. Wabash Computer decided to get out of the computer testing equipment business in 1973. Appellant acquired the line of business selling and leasing equipment designed to test single magnetic computer memory discs. Appellee acquired the line of business utilizing the "Pack Scan III" system, designed to test a pack or set of multiple discs. Both kinds of equipment were designed to be able to test and certify memory discs at different stages of production.

Wabash had been in the business for several years and had contractual obligations with its existing customers to be fulfilled in the future. Donald Oglesby, president of appellant, was formerly general manager of the Wabash Equipment Division. Edward McDonald, president of appellee, was formerly employed as a manager in the engineering group in the Equipment Division. McDonald expressed an interest in acquiring all of the testing equipment business. Wabash was not confident, however, that McDonald could fulfill the existing contractual obligations. Eventually, however, it was agreed that a corporation (appellee) to be formed by McDonald would acquire the Pack Scan III line, and a corporation formed by Oglesby (appellant) would acquire the single disc testing line. Oglesby's sworn statement of facts, presented in support of appellant's opposition to the motion to dismiss in the trial court contains the following:

The Plaintiff's willingness to accept Wabash's obligations to its existing customers depended on its having a viable single disc tester business to the extent that Wabash could provide it. What Wabash could do in that regard was to assure that in consideration of McDonald's taking the Pack Scan III, he would not compete with the Plaintiff with respect to any other part of Wabash's Equipment business, which was being transferred to the Plaintiff. This was part of the price paid by the Defendant for the Pack Scan III. Indeed, the obligations of Pace to refrain from such competition was limited on the period during which it contin-

ued to use the Pack Scan III technology in its business.

The Wabash-Three Phoenix (appellant) agreement was negotiated by Oglesby for Three Phoenix and William F. Boyd, Chairman of Wabash Magnetics[1], for Wabash. The Wabash-Pace (appellee) agreement was negotiated by Edward McDonald for Pace and by Oglesby and George E. Dashiell, then president of Wabash, for Wabash. The two arrangements were at all times considered a part of one plan for the disposition of the Wabash Equipment Division. It was known to McDonald that the interests of Three Phoenix were given great weight in formulation of the Wabash-Pace agreement, to the extent that Oglesby held virtual veto power over the Wabash-Pace agreement.

For as long as it was in the test equipment business, Wabash sold to a world-wide market. Wabash had fewer than fifteen customers world-wide for single disc testers in 1973. It is Oglesby's business judgment, and was at the time in question, that there cannot be a viable disc tester business which covers less than a world-wide market, due to the small volume of sales for such equipment.

It was the appellant's intention as well as the intention of the other parties to the above-described agreements that Pace be restricted from engaging in competition with the products then contemplated by Wabash and Three Phoenix for the testing of single discs for as long as Pace was using the Wabash technology purchased by it in its own business. It was not known how long such discs would last in the market, which time period would determine the length of viability of the market for single disc testers. It was, however, considered fair and reasonable to limit the restriction on Pace to the time during which it enjoyed the benefits of the technology transferred to it by Wabash. Also, it was then considered that the application of the technology purchased by Pace to single disc testing would give Pace an extra advantage over other competitors in the single disc tester

market. The possibility of such a result was precluded in the agreements because Three Phoenix purchased Wabash's entire single disc testing business.

Although the Wabash-Three Phoenix and the Wabash-Pace agreements seem on their face to have been made several months apart, they were in fact concurrently negotiated as part of an overall plan. The essence of the transaction between Wabash and Three Phoenix was known to McDonald when that agreement was made; that is, he knew that Wabash intended to and did transfer its entire equipment business to Three Phoenix excepting only that portion transferred to Pace. McDonald also knew that the ultimate decision as to whether to transfer anything to Pace was Oglesby's, and further, that the Pack Scan III technology would not be transferred without an agreement not to compete with respect to single disc testers.

The agreement between Wabash and Three Phoenix was consummated on June 6, 1973. In it, Wabash agreed to assign to Three Phoenix "rights under certain covenants not to compete", and the parties contemplated that the instrument would be effective to convey any existing covenant. The Wabash-Pace agreement was executed on October 11, 1973. It contains the following paragraphs nine and ten which are critical to this litigation:

9. *Non-Competition.* BUYER shall not during the term of this agreement within the world manufacture, use, lease, sell or otherwise dispose of any equipment or inventions which would directly or indirectly perform the same operations as said INVENTIONS or be in competition therewith nor shall BUYER for a period of two (2) years or for so long as they manufacture or sell said INVENTIONS, whichever period is longer, design, manufacture or sell any other equipment or products which were heretofore designed, manufactured or sold by the SELLER INCLUDING THE # SSA AND # SDT FOR THE WINCHESTER

1. Wabash Computer was a subsidiary of Wabash Magnetics, Inc.

DISC which SELLER intended to design, manufacture or sell.

10. *Non-Competition with Three Phoenix Company.* SELLER has sold the following product lines to Three Phoenix Company, an Arizona corporation: the certification equipment, disc memo and TCT–300. BUYER shall not in any way compete with Three Phoenix in said product lines and shall not engage in any business activity with respect to them, including without limitation consulting services, maintenance or the supplying of spare parts.

Appellant's complaint alleged on information and·belief that appellee was now competing with it in the market for single disc testers. Appellant sought to enjoin the competition on the basis of paragraphs nine and ten of the Wabash-Pace agreement and its own agreement of acquisition from Wabash.

The trial court held that the Wabash-Three Phoenix agreement of June 6, 1973 was ineffective to convey to Three Phoenix the right to enforce paragraph nine of the agreement entered into between Wabash and Pace Industries on October 11, 1973. The trial court also held that paragraph ten was illegal and unenforceable.

Appellee advanced three major contentions in the trial court:

(1) The Wabash-Three Phoenix agreement (entered into on June 6, 1973) could not effectively assign the covenant not to compete incorporated in the subsequent (October 10, 1973) Wabash-Pace agreement, and, since appellant failed to allege a previous oral covenant, appellant had no standing to enforce paragraph 9.

(2) The covenants and scheme of market division shown by the agreements and appellant's statement of facts constitute a *per se* violation of the federal and state antitrust laws, 15 U.S.C.A. § 1 and A.R.S. § 44–1402, inasmuch as they purport to accomplish a horizontal division of the computer disc testing market between Pace and Three Phoenix.

(3) Paragraph 10 of the Wabash-Pace agreement is unenforceable because the covenants therein are not reasonably limited—they are world-wide in scope and actually or potentially unlimited in regard to time.

■ We may dispose of the first issue briefly. Appellant is plainly a third party beneficiary with respect to paragraph 10 of the Wabash-Pace agreement and entitled to seek enforcement of the provision in that capacity. Appellee does not argue to the contrary. In regard to paragraph 9, Section 153 of the most recent tentative draft of the Restatement of Contracts states:

§ 153. Assignment of Future Rights

(1) Except as otherwise provided by statute, an assignment of a right to payment expected to arise out of an existing employment or other continuing business relationship is effective in the same way as an assignment of an existing right.

(2) Except as otherwise provided by statute and as stated in Subsection (1), a purported assignment of a right expected to arise under a contract not in existence operates only as a promise to assign the right when it arises *and as a power to enforce it.* (emphasis added)

Restatement 2d, Contracts, T.D. No. 3 (1967).

Thus, appellant is vested with the power to seek enforcement of the covenant. *See also, 4 Corbin on Contracts* § 874 (1951). Appellant's reference to the equitable source of the power to enforce a premature assignment has prompted appellee to urge that the argument was never presented to the trial court, but we note it was clearly encompassed by the memoranda below. *Cf. Crook v. Anderson,* 115 Ariz. 402, 565 P.2d 908 (App.1977).

The next question is whether the covenants, taken in context, are *per se* in violation of the antitrust laws. If they are, the judgment may be affirmed even though it appears to have been rendered on other bases.

By a literal reading of the Sherman Act, *any* agreement restraining trade is prohibited. *U.S. v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). A "rule of reason" has long been applied to the statute, however, thus acknowledging a legitimate basis for "reasonable" restraints. *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 834 (1910). Arizona follows the same rule of reason in regard to its antitrust law. *Dattilo v. Tucson General Hospital,* 23 Ariz.App. 392, 533 P.2d 700 (1975). Notwithstanding, certain types of agreements remain *per se* violative of the act.

> [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to' determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.

*Northern Pacific Railway Company v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958). However:

> It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act.

*Topco, supra,* 405 U.S. at 607–608, 92 S.Ct. at 1133. Where the covenant in question is ancillary to a main contract involving the sale of a business, the "rule of reason" rather than the *per se* rule is generally applied.

> Courts have distinguished "naked" covenants not to compete, deemed per se vio-

lations of the Sherman Act, from covenants merely ancillary to a main lawful contract. The latter, unlike the former, must be examined to determine if they are so unreasonable as to violate the antitrust laws.

*Sound Ship Building Corp. v. Bethlehem Steel Corp.,* 387 F.Supp. 252 (D.C.N.J.1975). *Sound Ship* involved a covenant restricting the seller from competing with the buyer, as do most of the reported cases. Appellee argues that the same rule should not apply where the buyer is restricted as against the seller. We do not agree.

> Again, when one in business sold property with which the buyer might set up a rival business, it was certainly reasonable that the seller should be able to restrain the buyer from doing him an injury which, but for the sale, the buyer would be unable to inflict. This was not reducing competition, but was only securing the seller against an increase of competition of his own creating. Such an exception was necessary to promote the free purchase and sale of property.
>
> \* \* \* \* \* \*
>
> For the reasons given, then, covenants in partial restraint of trade are generally upheld as valid when they are agreements ... (4) by the buyer of property not to use the same in competition with the business retained by the seller....

*United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 280–281 (6th Cir.1898), *aff'd,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899).

■ This does not mean that parties can restrict competition between themselves indefinitely. It is clear, though, that a covenant not to compete during a limited transition period while two formerly joined enterprises are stabilized may be justifiable as a reasonable restraint of trade.

> Unless injury to the public manifestly outweighs the public policies of honesty and of freedom of alienation, restrictive covenants should be enforced.

*Hall Mfg. Co. v. Western Steel & Iron Works,* 227 F. 588, 593 (7th Cir.1915). It would seem that, generally speaking, the transfer of a business from one to two or

more entities is to encourage competition rather than to discourage it. Increased competition should logically result in the long run. Where we are dealing with the transfer of a business with closely related product lines and common employees of the divesting employer, the use of limited covenants not to compete might facilitate such a divestiture. Thus, as a general matter, we see no reason why such covenants should be categorized as *per se* illegal. Rather, we think the "rule of reason" should be applied. *See Standard Oil, supra.*

Appellee further argues that the *Addyston* rationale for applying the "rule of reason" to the covenants in question applies only to the use of property, *i.e.*, the Pack Scan III device itself. We see no reason, however, why this rationale should not encompass the inventive technology that went into the production of the tangible property, especially where that technology is itself specifically mentioned in the covenants.

We thus come to the question of whether the covenants here might be considered reasonable upon a review of the record. The test for reasonableness involves four elements:

 (1) The restraint is ancillary to the main purpose of a lawful contract.

 (2) The restraint is neither imposed by a party with monopolistic power nor fosters a monopoly.

 (3) The restraint is partial in nature and reasonably limited in time and scope.

 (4) The restraint is no greater than necessary to afford fair protection to the parties and not so extensive as to interfere with the interests of the public.

*Sound Ship, supra,* 387 F.Supp. at 255.

In the instant case, paragraph 10 of the Wabash-Pace agreement is unlimited as to both space and time. The relevant second clause of paragraph 9 is also potentially unlimited inasmuch as it prohibits Pace from competing with Wabash (Three Phoenix, by assignment) as long as Pace is manufacturing or selling the Pack Scan III, which is essentially what it acquired by its contract with Wabash.

As to the space limitation, in a business of this nature (involving highly technical equipment and a small volume turnover), a restriction from the world-wide market might be considered reasonable. *See DeLong Corporation v. Lucas,* 176 F.Supp. 104 (S.D.N.Y.1959). However, the effective time of the restriction cannot lawfully be perpetual or indefinite. Nor do we believe that a reasonable time limit can be measured by Pace's use of the invention, since the Sherman Act is violated by the prevention as well as the destruction of competition, and a competitor cannot be unreasonably foreclosed from a substantial market. *Pennsylvania W. & P. Co. v. Consolidated G., E.L. & P. Co.,* 184 F.2d 552 (4th Cir.1950), *cert. den.* 340 U.S. 906, 71 S.Ct. 282, 95 L.Ed. 655 (1950).

We next consider whether covenants must be judged valid or invalid as they are written or whether the trial court may modify the agreements by scaling them down to that which is considered reasonable and enforcing the modification.

Authorities are sharply divided on this issue. *See Annot.* 61 A.L.R.3d 397 (1975). The majority of cases hold that they will not modify the covenants absent explicit authorizing language in the contract, since making modifications is in effect "rewriting the contract", a practice courts have historically been reluctant to engage in. The growing minority, however, take the view that the "all or nothing at all" approach of the majority attaches more importance to formality than to substance, and hold that the court should modify the stated terms where appropriate so as to make them reasonable and then enforce the covenant as modified. *See, e.g., Bess v. Bothman,* 257 N.W.2d 791 (Minn.1977), and *compare Rector-Phillips-Morse, Inc. v. Vroman,* 489 S.W.2d 1 (Ark.1973).

Notwithstanding *Wright v. Palmer,* 11 Ariz.App. 292, 464 P.2d 363 (1970), we believe it is still an open question in Arizona whether a court must in all cases enforce a covenant not to compete only as written, or if it is overly broad, whether it may restrict

the covenant and enforce it as limited. *Wright v. Palmer* is not controlling inasmuch as it involved an alleged oral covenant of very indefinite nature. The only Supreme Court decision arguably addressing this point, *Lassen v. Benton,* 86 Ariz. 323, 346 P.2d 137 (1959), *opinion modified,* 87 Ariz. 72, 347 P.2d 1012 (1959), concerned a covenant which was found wholly enforceable according to its terms. The more recent cases of *Esmark, Inc. v. McKee,* 118 Ariz. 511, 578 P.2d 190 (App.1978), and *Snelling & Snelling v. Dupay Enterprises,* 125 Ariz. 362, 609 P.2d 1062 (App.1980), suggest that modification may be appropriate.

 While we adhere to the general principle that courts will not rewrite contracts for the parties, we do not believe that parties who induce contracts by subscribing to covenants such as those under consideration here should be lightly released from all burden. It is the function of the court to uphold and enforce contracts in the absence of contrary compelling considerations of public policy. *Cf. Granger v. Craven,* 159 Minn. 296, 199 N.W. 10 (Minn.1924), quoted in *Lassen, supra,* 86 Ariz. at 325, 346 P.2d at 139. We believe that, generally speaking, the manifest intent of the parties is more closely served by *pro tanto* enforcement of covenants than by complete negation. We accordingly hold that the unlimited nature of paragraph 10 of the agreement did not *ipso facto* render the provision completely unenforceable. The same consideration would apply to the potentially infinite provisions of paragraph 9.

 On the present record of this case, we do not find the *per se* rule presently applicable, nor do we find modification and enforcement of the covenants in question absolutely foreclosed. The record at this state does not conclusively preclude relief. Accordingly, the judgment of the superior court is reversed, and the case is remanded for further proceedings compatible with this opinion.

CONTRERAS, P.J., and FROEB, J., concur.

## ON MOTION FOR REHEARING

YALE McFATE, Judge (Retired).

The appellee has presented a vigorous motion for rehearing. We have also permitted the Attorney General to file an *amicus curiae* brief in support of the motion for rehearing. These and the opposition to the motion for rehearing have focused our attention on authorities in the field of antitrust law not stressed in the briefs. For the assistance of the trial court and the bar we deem comment on some of the matters presented appropriate.

Appellee argues that since we determined that a durationally unlimited covenant not to compete was not sustainable, our task was at an end because there could be no partial enforcement of a covenant which was invalid as written. Appellee has cited in this regard *Kelly v. Kosuga,* 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959); *Schine Chain Theaters, Inc. v. United States,* 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245 (1948); *Edward Katzinger Co. v. Chicago Metallic Mfg. Co.,* 329 U.S. 394, 67 S.Ct. 416, 91 L.Ed. 374 (1947); *MacGregor v. Westinghouse Electric & Mfg. Co.,* 329 U.S. 402, 67 S.Ct. 421, 91 L.Ed. 380 (1947); *Sola Electric Co. v. Jefferson Electric Co.,* 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1942); *Associated Press v. Taft-Ingalls Corp.,* 340 F.2d 753 (6th Cir.1965), *cert. denied,* 382 U.S. 820, 86 S.Ct. 47, 15 L.Ed.2d 66 (1965); *Farbenfabriken Bayer, A.G. v. Sterling Drug, Inc.,* 307 F.2d 207 (3rd Cir.1962); *Lektro-Vend Corp. v. Vendo Co.,* 403 F.Supp. 527 (N.D. Ill.1975), *aff'd,* 545 F.2d 1050 (7th Cir.1976), *rev'd on other grounds,* 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009, *rehearing denied,* 434 U.S. 881, 98 S.Ct. 242, 54 L.Ed.2d 164 (1977).

Except for *Schine* and *Lektro-Vend,* none of the United States Supreme Court's cases which appellee cites involve covenants not to compete. Most of them deal instead with price-fixing provisions predicated upon a patent attacked as invalid. *Schine* was an action brought by the United States which involved a great many monopolistic prac-

tices on the part of the defendant. *Lektro-Vend* was primarily concerned with the issuance of an injunction to stop collection of a state court judgment which enforced challenged covenants not to compete. *Associated Press v. Taft-Ingalls* involved a tying arrangement. In *Farbenfabriken,* the parties had entered into an agreement to divide profits which had previously been adjudicated in violation of the Sherman Act. We cannot draw from any of these cases a principle that it is never appropriate to partially enforce an ancillary covenant not to compete. *Cf. Alders v. AFA Corp. of Florida,* 353 F.Supp. 654 (S.D.Fla.1973), *aff'd without opinion,* 490 F.2d 990 (5th Cir.1974).

References in the case law and in our opinion to "modifying" the contract of the parties and "enforcing the covenants as modified" need clarification. Where a covenant not to compete is durationally excessive and hence unlawful, and the court, after determination of a reasonable time limitation enforces the covenant *pro tempore,* it does not thereby "modify" the covenant in the sense of exercising any power of reformation. *See* Restatement (Second) of Contracts § 184, note b (1981). The court does not alter the covenant which the parties made nor does it enforce an unlawful covenant. It simply requires the defaulting party to live up to his bargain for the limited period of time commensurate with what is reasonable and lawful and refuses enforcement beyond that time.

Appellee also cites section 518 of the Restatement of Contracts (1932) for the proposition that a covenant not by its terms divisible will be denied partial enforcement. While that was formerly the view of the Restatement, section 184 of the Restatement (Second) of Contracts (1981) takes a view consistent with our decision in regard to partial enforcement.

Appellee also contends that the covenants cannot be viewed as ancillary to a legitimate transaction, that they were broader in scope than could be deemed necessary, and that in any event our decision fails to provide the trial court with a standard for enforcement. We shall address these contentions together. Initially, it must be borne firmly in mind that this case is before us on a motion for summary judgment. Summary judgment may not be granted if there is the slightest doubt in regard to the essential, material facts. *Wisener v. State,* 123 Ariz. 148, 598 P.2d 511 (1979). The field in which the parties are engaged involves complex technology. Without delving at length into the facts, we note that appellant has alluded to what it regards as factual issues and that appellee questions, for example, whether or not the technology involved is capable of being protected. *See A. & E. Plastik Pak Co., Inc. v. Monsanto Co.,* 396 F.2d 710 (9th Cir.1968). We do not perceive that the material facts are yet developed beyond the stage of slightest doubt.

If the appellant is entitled to injunctive relief, it must arise out of the reasonably perceived necessities of this situation involving a voluntary sale of capital assets. If under all of the circumstances some measure of protection in the form of a non-competition covenant was practically essential to effectuate a sale on reasonable terms, then such a covenant may be enforced to that extent. The covenant, however, may not be enforced beyond that extent, and it may not be enforced at all if the dominant objective of the party seeking enforcement was to obtain a monopoly rather than to facilitate a sale to a viable enterprise, with incidental appropriate restrictions on competition for his own protection. The concern of Wabash for its existing warranty obligations is also a matter which may be considered in evaluating the necessity of a non-competition covenant. *Cf. Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (manufacturer's vertical restriction on franchisee's retail location must be judged under rule of reason analysis).

Just as mergers are not inherently or always and invariably anticompetitive, neither is the sale of a business or businesses by one entity to two new entities inherently or always and invariably procompetitive.

**134**

On the other hand, there is clearly a value in facilitating the market for capital goods, and in a case like the present one, two new potential competitors have been created where formerly there was but one corporate entity which presumably was not under a duty to intramurally compete in regard to development of its two product lines. *Cf. Joseph E. Seagram and Sons, Inc. v. Hawaiian Oke and Liquors, Ltd.,* 416 F.2d 71 (9th Cir.1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755, *rehearing denied,* 397 U.S. 1003, 90 S.Ct. 1113, 25 L.Ed.2d 415 (1970) (alcoholic beverage distiller and the various divisions of its wholly owned subsidiary distributor not to be treated as separate, competitive entities). This is the outstanding difference between the present case and a case like *Wedgewood Investment Corp. v. International Harvester Co.,* 126 Ariz. 157, 613 P.2d 620 (App.1979). The basic genre of agreement involved here has usually been considered subject to the "rule of reason" and we are unable to perceive that the record thus far developed in this litigation mandates the application of a different rule (see the discussion of *United States v. Addyston Pipe & Steel Co.,* 85 F. 271 (6th Cir.1898), *affirmed as modified,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899), in *Alders v. AFA Corp. of Florida,* 353 F.Supp. at 656–57).

The parties seeking rehearing refer to the "uneven bargaining power" of Oglesby over McDonald, in that Oglesby, as noted in the original opinion, "held virtual veto power" over any contract between Wabash and Pace involving the proposed sale, and argue that consequently the "rule of reason" is inapplicable. Restatement (Second) of Contracts § 184, note b (1981). We did not intend to infer by the language employed that the virtual veto power was unlawfully exercised or was other than the power to say "no" possessed by a negotiator of a contract in which he has a financial interest. The negotiations in this case were instigated by McDonald. There is no contention that any fiduciary relationship existed between him and Oglesby or that his acceptance of the tripartite arrangement resulted from economic duress. We find

nothing in the record thus far presented to indicate that Oglesby used his bargaining power to unfairly exact from McDonald a clearly unlawful promise such as to preclude the application of the "rule of reason" to the enforcement of the covenants here involved.

The parties have urged us to expound on various other aspects of the case, but we think what has been written suffices to dispose of the matter on summary judgment. We think that what the State describes as various peculiarities in the case can be more properly considered with a fully developed record.

For the foregoing reasons, the motion for rehearing is denied.

CONTRERAS, P.J., and FROEB, J., concur.

NOTE: The Honorable YALE McFATE was authorized to participate in this matter by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. art. VI, § 20.