324 F.2d 807
 139 U.S.P.Q. 417
 L. B. LINDBECK, d/b/a Speedline Manufacturing Company, Appellant,
v.
The WYATT MANUFACTURING COMPANY, Inc., Thomas G. Aird and J.
W. Spaeth, Appellees.
The WYATT MANUFACTURING COMPANY, Inc., Cross-Appellant,
v.
L. B. LINDBECK, d/b/a Speedline Manufacturing Company, Cross-Appellee.
 Nos. 7268, 7269.
 United States Court of Appeals Tenth Circuit.
 Dec. 2, 1963.
 
 Clifford L. Malone, Wichita, Kan., and Don W. Noah, Beloit, Kan. (Mark H. Adams, Charles E. Jones, William I. Robinson, J. Ashford Manka, Mark H. Adams, II, John S. Seeber, Philip L. Bowman and Joe Rolston, Wichita, Kan., on the brief), for appellant and cross-appellee.
 John Q. Royce, Salina, Kan. (E. S. Hampton, H. H. Dunham, Jr., H. G. Engleman, C. Stanley Nelson, Jack N. Stewart and Thomas Hampton, Salina, Kan., on the brief), for appellees and cross-appellant.
 Before MURRAH, Chief Judge, and LEWIS and BREITENSTEIN, Circuit judges.
 LEWIS, Circuit Judge.
 
 
 1
 Plaintiff sought damages for breach of a patent licensing contract and also compensatory and punitive damages for alleged interference with his business. The trial court found that defendant rightfully terminated the contract and was obligated to the plaintiff only for the minimum licensing fee payable upon and prior to the termination of the contract. Both parties appeal from a judgment intended to reflect the court's decision.
 
 
 2
 Mr. Lindbeck is the owner of a patent, obtained in 1956, on a land leveling machine trade-named Speedline Scrape -A-Plane. Prior to patent he had manufactred the machine in his small factory at Las Cruces, New Mexico, marketed it primarily in the southwestern part of the United States, and had established a distributor, Rossville Implement Company, in Kansas.
 
 
 3
 On September 12, 1957, Lindbeck and the Wyatt Manufacturing Company entered an agreement whereby Wyatt would manufacture and market the Speedline Scrape-A-Plane and sell throughout the United States except in an area reserved by Lindbeck and served by his factory in Las Cruces. In that area were the states of Louisiana, Arkansas, Texas, New Mexico, Arizona, California, Nevada, Utah, Idaho, Oregon, and Washington. For the privilege, Wyatt was to pay a percentage of its net price depending on volume and guaranteed to pay a minimum fee based on a sales volume of $100,000 per year after July 1, 1958.
 
 
 4
 Although the venture began in the usual high hopes and spirit of good fellowship, it deteriorated within a year to a correspondence of quarrelsome demands and accusations. However, the parties continued to discuss increasing the burden of their relationship by adding another of Lindbeck's patented machines, a dirt buggy, to the license held by Wyatt. On November 29, 1958, Wyatt sent a letter to Lindbeck, which is claimed to be formal notice of termination of the original contract:
 
 
 5
 'Dear Lin:
 
 
 6
 'In accordance with our conference when you were in Salina a few days ago, we are submitting this agreement in duplicate under the assumption (on which you concur) that the Speedline Dirt Carrier can be manufactured to sell at a competitive price. I am sure you will agree to give your full cooperation toward this result.
 
 
 7
 'I am sure you will find it satisfactory and will appreciate your signing both copies and returning them to us for our signature, after which one will be returned to you for your files.
 
 
 8
 'This letter may also be considered as official notice that we are terminating the old agreement as of this date.'
 
 
 9
 Enclosed in the letter was a new contract, similar to the original contract but including the dirt buggy patent and omitting two of the states from Lindbeck's reservation of manufacturing and selling rights. Wyatt's letter passed in the mail with one from Lindbeck which discussed some of the difficulties between the parties and concluded:
 
 
 10
 'If you wish to completely drop Speedline, then let us know and we will be glad to sell all the machines you now have in stock and move all your jigs at a reasonable price to another company near by. * * *'
 
 
 11
 Despite this apparent mutual attitude toward termination of the agreement, Lindbeck wrote Wyatt on December 4:
 
 
 12
 'This is to notify you that the old agreement has not been terminated until a new one has been reached, and also signed.
 
 
 13
 'If our first agreement is so flexible that you can notify us in a certified letter that you are terminating it, and our legal advisor agrees with you, then we are not interested in an agreement of the same type.'
 
 
 14
 Correspondence, telephone calls, and personal meetings continued until August, 1959, with Lindbeck apparently regarding the contract as governing the relationship of the parties and Wyatt insisting that the contract had been terminated, but negotiations for a new contract were conducted. Finally, Wyatt wrote:
 
 
 15
 'We notice in going through Ed's (recently deceased) file, that considerable correspondence developed regarding the new contract, and apparently neither Wyatt nor Speedline could arrive at any definite understanding. In as much as the contract was terminated in '1958', we feel it best to make an outright break altogether and to offer you the machines and inventory which we have on hand under the terms of paragraph thirteen in the contract dated September 12, 1957. * * *'
 
 
 16
 Subsequent effort to arrange a sale of the inventory to Lindbeck was fruitless and Wyatt began a series of advertisements in the territory reserved to Lindbeck offering the Scrape-A-Plane at reduced prices. Although Wyatt Company failed to dispose of any of its machines in the southwestern area, plaintiff alleged that his anticipated sales were diminished by half during the yars 1960 and 1961 as a result of the advertising.
 
 
 17
 The trial court rendered judgment for the plaintiff for minimum royalties of $5,000 for the period July 1, 1958 to July 1, 1959, subject to set-offs for royalties paid and for the earned royalties for sales subsequent to that time. It found that defendant's termination of the contract and its efforts to sell in the territory otherwise reserved to plaintiff were in conformity with contract provisions and hence no damages would lie as to this portion of the complaint.
 
 
 18
 Appellant Lindbeck cites as error in the trial court its failure to award $5,000 per year minimum royalties subsequent to July 1, 1959, and its failure to award actual and punitive damages for Wyatt's operation in appellant's reserved territory. Cross-Appellant Wyatt Manufacturing Company asserts that it was not obligated under the terms of the contract for the minimum royalty for the period of January 1959 to July 1959 nor for royalties on any machines sold after July 1, 1959, and that the court erred in awarding interest upon the various accounts herein involved.
 
 
 19
 The trial court found that the Wyatt Company justifiably made a good-faith determination that the Speedline Scrape-A-Plane would not sell against competition and terminated the contract in accordance with the pertinent provision:
 
 
 20
 '9. Licensee has the right to terminate this agreement if it finds that the Scrape-A-Plane will not sell against competition or if the Scrape-A-Plane becomes obsolete, as of the first day of any calendar year by giving thirty (30) days notice in writing to the licensor of its intention to so terminate said agreement.'
 
 
 21
 The statements and attitudes of the parties both before and after the execution of the contract and before and after the notice of termination were inconsistent. as often occurs in business relationships, each party apparently attempted to gain an advantage in dealing through a type of psychological warfare. Prior to entering the contract, Lindbeck demanded that royalties be guaranteed on a minimum $200,000 per year; Wyatt Company countered with an offer to guarantee $50,000 in business. Lindbeck's enthusiasm for his invention was expressed constantly in predictions of large volume sales and was effective in igniting a responsive enthusiasm in the Wyatt Company, which, immediately after the execution of the contract, began a fullscale promotion of the machine. A greater amount of money and time was devoted to the promotion and selling of the Speedline Scrape-A-Plane than had been given any of the other products in Wyatt's line. However, despite the enthusiasm and effort on the part of both Wyatt and Lindbeck, the sale of the machines moved slowly. The Wyatt Company sold only 14 machines during 1957 and 1958, and Lindbeck, who had believed that sales in his territory would be at least 100, sold only 33.
 
 
 22
 Disappointment evidenced itself in edgy correspondence with each party threatening to discontinue the relationship, but still jockeying for ascendancy in a potential continuance. Thus, the apparent inconsistency of Wyatt's termination notice on the grounds that the machine would not sell against competition with the enclosure of a new contract on the same machine is noted.
 
 
 23
 The trial court, relying upon the extrinsic evidence to explore the application of the termination clause, found that the sales consummated did not reach the volume contemplated by the contract, justifying Wyatt's conclusion that the machine would not sell against competition. Although the inferences to be drawn as to the intention of the parties in entering the contract and in the subsequent dealings are equivocal, the trial court's determination is supported by the record and this court will not therefore substitute its judgment for the inferences drawn by the trial court, Friedman v. Sealy, Inc., 10 Cir., 274 F.2d 255; Wilsey-Bennett Trucking Co. v. Frost, 10 Cir., 275 F.2d 144.
 
 
 24
 The court, finding a proper termination of the contract as of January 1959, proceeded to determine the rights of the parties after termination. It held that Wyatt Company was liable for the guaranteed minimum of $5,000 license fees for the accounting year July 1, 1958 to July 1, 1959, but that the guarantee expired on the latter date. For sales occurring subsequent to that time, Wyatt is liable for a royalty fee of 5 per cent of the price. By appeal and cross-appeal, both parties challenge these portions of the judgment.
 
 
 25
 The Wyatt Company asserts that the provision for a guaranteed minimum fee was executory, not being due until the end of the accounting year, and that the termination of the contract cancelled the remaining executory obligations, citing Blain v. Sullivan-Waldron Products Co., D.C.Del., 78 F.Supp. 661. . however, the trial court found specifically that the contract was not terminated by mutual agreement to discharge the contractual duties arising thereunder. See A.L.I. Restatement of the Law, Contracts, 432. The contract provided for a minimum guarantee during the period July 1, 1958, to July 1, 1959, although the date for exercise of termination powers was set as of the calendar year, and the minimum amount was payable regardless of whether or not the licensee manufactured and sold any of the patented implements during the accounting period, Hazeltine Research v. Automatic Radio Mfg. Co., 77 F.Supp. 493 aff'd. 1st Cir., 176 F.2d 799, aff'd. 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312.
 
 
 26
 Appellant Lindbeck contends that even though the agreement was rightfully terminated the continued exercise of the rights and privileges granted under the contract makes the licensee liable for the minimum guaranteed royalty for each year subsequent to 1958. Twenty-five machines were manufactured after the notice of termination and efforts to sell were continued with a sale occurring in June, 1961. It is urged that the failure to apply the total provisions for compensation leads to a situation where the licensee had greater rights after the termination of the contract than it had during its existence. Appellee Wyatt Company, on the other hand, claims that royalties awarded by the court on machines sold after the notice of termination, an apparent total of $832.56, were erroneously awarded since no payment provision appears for machines sold after termination of the contract:
 
 
 27
 '13. In the event, however, that this license is terminated for any reason provided in this agreement, licensor agrees to permit licensee to sell any finished Scrape-A-Planes or accessories and licensor also agrees to permit licensee to continue manufacturing, using and selling Scrape-A-Planes or accessories until such time as all raw materials purchased expressly for the Scrape-A-Plane, and accessories by licensee is consumed; or licensor shall have the option to purchase any finished machines, accessories and parts and any raw materials purchased expressly for the Scrape-A-Plane remaining on hand in the stock of the licensee at the price provided in paragraph 6 on finished machines, accessories and parts and net delivered cost of any raw material expressly purchased for Scrape-A-Plane or accessories and parts therefor.'
 
 
 28
 Clearly, paragraph 13 of the contract provides for the dissolution of the business of manufacture and sale in the hands of the licensee and the 5 per cent royalty payment to which the parties agreed is a reasonable reward on the patent. United States v. Palmer, 128 U.S. 262, 9 S.Ct. 104, 32 L.Ed. 442. Wyatt cannot escape the payment of a reasonable royalty for the benefits it receives under the termination provisions nor can Lindbeck demand the perpetuation of clauses of a contract rightfully terminated.
 
 
 29
 Appellant Lindbeck further claims that the termination clause did not permit the invasion of his reserved territory in efforts to dispose of machines on hand. Paragraph 13 is not expressly limited by the territorial limits of the contract, but it does offer mutual escapes from the contemplated disasters of disruption of the business relationship. The licensee was permitted to consume its raw materials in manufacture of the machines and to sell them competitively; the licensor had an option to purchase the machines and raw materials to prevent encroachment on his business. The failure of the termination clause to perform the functions for which it was designed was not due to the inadequacy of the contractual provision but the inability of the parties to yield to its wisdom. Wyatt offered the machines and raw materials to Lindbeck on several occasions; Lindbeck refused to even discuss the matter and thus must accept the consequences permitted under paragraph 13.
 
 
 30
 The trial court allowed plaintiff 6 per cent interest upon royalties as they became due at various dates. Crossappellant protests the allowance, urging that under Kansas law no interest is allowable on mutual accounts or unliquidated claims, Govenius Bros. v. Reagor, 130 Kan. 711, 288 P. 537; Southern Painting Company of Tenn. v. United States, 10 Cir., 222 F.2d 431. Although there were credits and debits entered in the accounting books of Wyatt Manufacturing Company concerning numerous transactions with regard to the machines, the disputed royalties arising under the contract were not made subject to the subsequent business dealings of the parties. Such an account does not fall within the definition of mutual accounts adopted by the Kansas Supreme Court, Lapham v. Kansas & Texas Oil Gas & Pipe Line Co., 87 Kan. 65, 123 P. 863, 865. Nor were the amounts due unascertainable-- the dispute was concerned merely with whether or not they were owing. The claims were liquidated and interest was properly allowed from the date of the transactions upon which they arose.
 
 
 31
 Finally, cross-appellant suggests that the amount of the judgment does not correctly reflect the intent of the trial court's decision. Cross-appellant admits that such error, if one there be, was not called to the trial court's attention under Rule 52(b) nor does it constitute a simple mechanical error referred to in Rule 60. In such posture, as cross-appellant frankly concedes, the suggestion may not be considered for the first time upon appeal.
 
 
 32
 The judgment is affirmed. Each party shall bear his own costs.