**Lula Belle HULL, Executrix of the Estate of R.D. Hull, Deceased, M.H. Parry, and H.A. Binford, Plaintiffs-Appellees,**

v.

**BRUNSWICK CORPORATION, Defendant-Appellant.**

No. 81–1632.

United States Court of Appeals, Tenth Circuit.

April 14, 1983.

---

William J. Stellman of Wegner, Stellman, McCord, Wood & Dalton, Chicago, Ill. (C.S. Lewis, III of Robinson, Boese & Davidson, Tulsa, Okl., with him on the brief), for defendant-appellant.

Philip J. McGowan of Sanders & Carpenter, Tulsa, Okl. (Fritz L. Schweitzer, Jr. of Mandeville & Schweitzer, New York City, with him on the brief), for plaintiffs-appellees.

Before HOLLOWAY, BREITENSTEIN and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

Brunswick Corporation appeals a judgment against it in favor of the estate of R.D. Hull, M.H. Parry, and H.A. Binford. Hull, who began the litigation before his death, sought payment of royalties under a licensing agreement for his patented fishing reel inventions. Parry and Binford each had an interest in Brunswick's royalty payments on Hull's patents. Brunswick defended on grounds of patent misuse and patent invalidity. Trial was to the judge without a jury, and the parties stipulated that royalties plus interest for the period involved totalled $1,145,851.54. Judgment was entered for that amount.

Brunswick argues that the trial court erred in failing to find that provisions of the licensing agreement violate the rule against patent misuse. The provisions complained of are: (1) the royalty arrangement, which required Brunswick to pay Hull 7% of Brunswick's net selling price on any reel using Hull patents, regardless of how many patents or which patents were used; (2) a clause that prohibited the licensee from modifying the design of licensed reels without the licensor's consent; (3) a clause that required improvements to the reels made by employees of the licensee to come under the agreement; and (4) a clause that extended the life of the agreement until the last patent had expired. Brunswick also asserts that the trial court erred in granting summary judgment for Hull on Brunswick's invalidity defense.

R.D. Hull was a prolific inventor of fishing reels and fishing reel components, upon many of which he was able to secure patents. His most important patented invention was the closed-face spinning reel, an

immensely popular item that almost immediately captured a large share of the fishing reel market. Much of Hull's genius evidently sprang from his ability to continue to create improvements in reel design and performance. Many of these improvements were also patented. Hull received wide acclaim in the fishing reel industry, both for his original invention of the closed-face reel and for his ability to improve and market closed-face reels year after year.

Hull invented his first closed-face reel in the early 1950s. In 1952 he entered into a licensing agreement with the Zero Hour Bomb Company (later renamed Zebco, Inc.) to produce the reels. The agreement was drafted by Parry, who was then vice president and general counsel of Zebco. The agreement was in essence a redraft of an earlier agreement between Hull and Zebco, which had been drafted by a Zebco patent lawyer. Hull was not represented by a lawyer on either occasion. Among other provisions, the agreement called for Zebco to pay Hull a 7% royalty on every reel that utilized one of his patents.[1] Hull became an employee of Zebco and in that capacity helped Zebco manufacture and sell the reels. The Zebco reels were immediately successful, and the company continued under the agreement to produce reels, incorporating various other patented Hull inventions, for about nine years.

In 1961 Brunswick acquired Zebco. Zebco's most important asset at the time of the acquisition was the Hull licensing agreement. Brunswick reviewed the entire licensing agreement and requested one change: elimination of a clause forbidding the licensee to sell competing reels. Hull agreed to this change, the clause was deleted, and Brunswick accepted the remainder of the agreement without alteration.

Zebco became a Brunswick division and Hull became a Brunswick vice president,[2] continuing to design and promote new reels

and reel components. Except for making one more minor amendment in 1971, Brunswick and Hull continued to operate under the original licensing agreement for fifteen more years, apparently with no complaint or problems. However, about the time the last of Hull's basic patents expired, Brunswick expressed dissatisfaction with the arrangement. On June 1, 1976, Brunswick wrote a letter to Hull requesting that he break down the 7% per reel royalty into specific percentage rates for each of his patents and requesting elimination of three other provisions of the licensing agreement. Hull agreed in a letter that the three deletions could be made, but he refused to alter the royalty arrangement. Brunswick suspended royalty payments on July 1, 1976, offering to reinstate them at the new rate when a new rate was agreed upon. No agreement was reached on a new royalty structure, and Brunswick gave notice of termination of the license under the terms of the agreement on December 22, 1976. The termination became effective January 28, 1977. Hull sued Brunswick for the unpaid royalties.

The trial court found that the royalty arrangement did not force Brunswick to pay for patents it did not desire or use and hence was enforceable. It further found that none of the other clauses Brunswick complained of had ever been enforced or relied upon by Hull. This lack of enforcement and Hull's September 30, 1976 letter agreeing to relinquish those clauses convinced the court that no patent misuse had occurred. Finally, the court rendered summary judgment against Brunswick on the patent invalidity claim, holding that Brunswick's failure to timely assert invalidity barred its assertion as a defense in this action. Brunswick appeals each of these rulings.

I

We first examine the royalty provision. The contract called for Brunswick to pay

---

1. Parry and H.A. Binford, the manager of Zebco, each received a 1/7th share of the royalty payment, or 1%; Hull received the remaining 5%. All plaintiffs have identical interests in the outcome of this litigation.

2. Parry became an officer of the Zebco division of Brunswick, and Ralph Lafferty, who had replaced Binford as general manager of Zebco, became president of the Zebco division.

the plaintiffs 7% of Brunswick's net selling price of each reel that contained one or more Hull patents. If a reel contained more than one Hull patent no additional royalty was levied. If a reel did not contain any Hull patents Brunswick paid no royalty to Hull. Both the 1948 and 1952 agreements were drafted by Zebco representatives, and the record indicates the Zebco-Hull royalty arrangement was mutually convenient and satisfactory. At the time of the acquisition by Brunswick, Brunswick did not request any change in the royalty provision, even though it did request one other change. The royalty arrangement continued for fifteen years after the acquisition by Brunswick without complaint. The trial court found and the record makes clear that Hull in no way coerced Brunswick's acceptance of the arrangement.

■ Prior to Brunswick's objection on June 1, 1976, the royalty provision was valid. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). There the Supreme Court stated:

"The Court's opinion in *Automatic Radio* [*Manufacturing Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950),] did not deal with the license negotiations which spawned the royalty formula at issue and did not indicate that HRI used its patent leverage to coerce a promise to pay royalties on radios not practicing the learning of the patent. No such inference follows from a mere license provision measuring royalties by the licensee's total sales even if, as things work out, only some or none of the merchandise employs the patented idea or process, or even if it was foreseeable that some undetermined portion would not contain the invention. It could easily be, as the Court indicated in *Automatic Radio,* that the licensee as well as the patentee would find it more convenient and

efficient from several standpoints to base royalties on total sales than to face the burden of figuring royalties based on actual use. If convenience of the parties rather than patent power dictates the total-sales royalty provision, there are no misuse of the patents and no forbidden conditions attached to the license."

*Id.* at 138, 89 S.Ct. at 1584 (footnote omitted). If a noncoercive royalty agreement that is based on the licensee's sales of all articles—those employing the patents and those not—is permissible, a noncoercive agreement based on sales only of articles employing the patents is a fortiori permissible. *See Well Surveys, Inc. v. Perfo-Log, Inc.,* 396 F.2d 15 (10th Cir.) (package licensing permissible absent coercion), *cert. denied,* 393 U.S. 951, 89 S.Ct. 374, 21 L.Ed.2d 362 (1968); *McCullough Tool Co. v. Well Surveys, Inc.,* 343 F.2d 381, 408–10 (10th Cir.1965) (same), *cert. denied,* 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 *and* 385 U.S. 990, 87 S.Ct. 601, 17 L.Ed.2d 451 (1966). Brunswick contends, however, that the agreement became coercive after June 1, 1976, when Brunswick demanded and Hull refused to quote individual royalty rates for each patent. It argues that Hull's refusal to "unbundle" the royalty rate was a misuse of his patents and relieved Brunswick of its royalty obligation from the date it first made the demand. Brunswick contends that Hull was obligated to renegotiate the royalty provision and establish individual rates for each patent without terminating the existing exclusive license agreement.[3]

To establish misuse, Brunswick had to show that Hull's failure to renegotiate when Brunswick became dissatisfied transformed the previously valid agreement into one that extended Hull's monopoly in a manner contrary to law. This Brunswick did not do. Brunswick was able to show that it objected to the longstanding arrangement, that it wanted to negotiate an

---

**3.** There is little question that Brunswick expected the existing agreement to remain in force. In its June 1, 1976 letter requesting the "unbundling," it told Hull it had the right to "individual royalty rates for the patents under exclusive license to us without surrendering our license." A similar statement appeared in Brunswick's November 8, 1976 rate proposal to Hull. When negotiations finally broke down, Brunswick chose to exercise the termination clause of the agreement, which provided thirty more days of exclusive use of the patents.

individual price for each patent, that it did not want to bargain for individual license agreements for each patent, but wanted to negotiate within the framework of the existing license agreement, and that Hull was willing to negotiate price to a certain extent (he offered to drop the pool price from 7% to 5.25% if Brunswick made certain concessions), but claimed setting a separate rate for each patent would be difficult and impractical. None of these facts demonstrates that Hull's ultimate refusal to renegotiate the royalty structure forced Brunswick to pay for patents it did not want or to pay royalties on unpatented items or processes. The facts appear to demonstrate the contrary. Brunswick was interested in keeping its exclusive license on all Hull patents it was using;[4] it just wanted to pay for the patents differently.[5]

If it could be shown that the refusal to negotiate individualized rates was merely a sham that forced the purchaser to accept unwanted patents in order to secure desired patents, that refusal could constitute patent misuse. *See American Securit Co. v. Shatterproof Glass Corp.*, 268 F.2d 769 (3d Cir.) (mandatory, coercive package licensing is misuse), *cert. denied*, 361 U.S. 902, 80 S.Ct. 210, 4 L.Ed.2d 157 (1959). Here, however, Brunswick did not show that the refusal to agree to individualized rates itself forced Brunswick to pay for patents it did not want in order to obtain those it did.

The law does not force a patentee to renegotiate any specific terms within the framework of an existing agreement. It may circumscribe the kinds of terms he can seek, *see, e.g., Morton Salt Co., Inc. v. G.S. Suppiger Co.*, 314 U.S. 488, 490–92, 62 S.Ct. 402, 404, 86 L.Ed. 363 (1942) (forbidding tying use of patent to purchase of unpatented products), or the manner in which he seeks them, *see, e.g., American Securit Co. v. Shatterproof Glass Co.*, 268 F.2d 769 (refusal to offer any terms other than mandatory package). It may permit a licensee to avoid the obligations of an oppressive agreement. But the law will not reform an agreement merely to suit the present desires of one of the parties. If Brunswick became dissatisfied with its arrangement with Hull, it could end that arrangement within the terms of the agreement.[6] There is no legal compulsion to negotiate individual rates in the first instance and there is no legal compulsion to renegotiate them later upon demand. If freed of the Brunswick contract, Hull was entitled to attempt to negotiate a one-price arrangement with any other willing licensee, *see Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129, if such an arrangement proved convenient to both

---

**4.** Brunswick received two important benefits by virtue of the contract's remaining in force while Brunswick made its demands. First, the agreement gave Brunswick an exclusive license on the Hull patents it used. Therefore, as long as the agreement remained in force (even though the royalty provision was in question) Brunswick retained its competitive advantage over other reel manufacturers. Second, the contract provided that all Hull patents, existing and after-acquired, would come under the terms of the license agreement. They remained a part of the exclusive licensing arrangement whether or not Brunswick actually used them. Lafferty, president of the Zebco division, testified that this arrangement was very desirable for Brunswick because patents that were not used by Brunswick could not be used by its competitors either: "[T]he more things we had sitting in our safe somewhere to keep other people from competing with us, the more secure we were."

**5.** Brunswick does not claim that the arrangement forced it to pay royalties on items not employing at least one Hull patent; indeed it stipulated the contrary. Nor does Brunswick complain that Hull refused to license each patent separately rather than licensing all of the patents as a pool; it never asked Hull to do so. The parties stipulated that "Brunswick never requested separate License Agreements on each of the licensed patents, but did request that separate patents be assigned separate royalties."

**6.** The existence of a termination clause does not itself eliminate the illegal nature of an oppressive license agreement. *See American Securit Co. v. Shatterproof Glass Corp.*, 154 F.Supp. 890, 895 (D.Del.1957), *aff'd*, 268 F.2d 769 (3d Cir.), *cert. denied*, 361 U.S. 902, 80 S.Ct. 210, 4 L.Ed.2d 157 (1959). But when the agreement is legal and enforceable, its termination provisions provide a viable method for a dissatisfied party to end the relationship.

parties and not oppressive.[7] He was not obligated to continue his relationship with Brunswick on Brunswick's terms.

The record indicates that this royalty structure was an efficient and mutually beneficial arrangement for a number of years. *Compare Well Surveys, Inc. v. Perfo-Log, Inc.,* 396 F.2d 15. That Brunswick became dissatisfied with it did not require Hull to restructure it. There is no suggestion Hull failed to negotiate in good faith from July through December. When it became clear that no new agreement would be reached, Brunswick terminated under the contract and for the next thirty days continued to receive the benefits of that contract—exclusive license of the Hull patents. *See Lindbeck v. Wyatt Manufacturing Co.,* 324 F.2d 807, 811 (10th Cir.1963). Hence, nothing related to the royalty provision relieved Brunswick of its obligation to pay royalties to the plaintiffs during the time in question.

## II

█ In addition to the royalty clause of the contract, Brunswick claims that each of three other provisions was a misuse of patents and relieved Brunswick of its royalty obligations. We address each provision separately.

█ Article IX, paragraph 1 of the agreement states:

"It is mutually agreed that in manufacturing said fishing reels Licensee will not be permitted to change the design thereof in any material respect without the consent of Licensor."

Brunswick argues that this section "violates federal patent law." It poses various hypothetical instances in which such a provision could restrain the licensee in a manner contrary to the spirit of patent cases. That a contractual provision might in some circumstance be turned to an illegal use does not obviate the need to examine the context in which the provision actually existed. A licensor may in particular circumstances be permitted to retain some control over the design of the patented product. *See generally Bela Seating Co. v. Poloron Products, Inc.,* 438 F.2d 733, 739 (7th Cir.) ("A licensor may restrict the licensee's manufacture of the patented item to a specific use or design."), *cert. denied,* 403 U.S. 922, 91 S.Ct. 2228, 29 L.Ed.2d 701 (1971). Furthermore, the trial court found, "There is no evidence that the Licensee was ever refused permission to change the design of any of the fishing reels covered by the License Agreement." No evidence in the record indicates that this provision was anything but a dead letter. *See Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 835, 70 S.Ct. 894, 898, 94 L.Ed. 1312 (1950). Brunswick's June 1, 1976 letter asked that this provision be eliminated and Hull's September 30, 1976 letter agreed that the provision "can and should be eliminated." We agree with the trial court that this provision did not relieve Brunswick of its royalty obligation.

Article IV, paragraph 2 of the license agreement provides:

"In the event employees of Licensee shall make any improvements in said fishing reels said improvements and any applications and patents therefor shall likewise come under this Agreement and be subject to all the terms and provisions hereof."

Brunswick argues that this provision is a misuse of patents because it inhibits the licensee from inventing improvements that would increase the efficiency or desirability of the product or eliminate patented features of the product that would reduce the price to the consumer. The Supreme Court has held that "the inclusion in the license of

---

**7.** If a potential licensee could show that Hull's consistent policy was to sell his patents only as a package, and that this package was undesirable and forced purchase of unwanted patents, it could establish a misuse by Hull. *See American Securit,* 268 F.2d 769. But Hull had dealt with only one company, Zebco and its successor Brunswick, and could not be shown to have consistently refused to deal on a nonpackage basis. His one refusal to renegotiate with Brunswick without termination of the existing agreement did not establish illegal or coercive behavior.

the condition requiring the licensee to assign improvement patents is not *per se* illegal and unenforceable." *Transparent-Wrap Machine Corp. v. Stokes & Smith Co.,* 329 U.S. 637, 648, 67 S.Ct. 610, 616, 91 L.Ed. 563 (1947). The Court found that such a clause served as consideration for the license: the licensor gave the licensee the right to use the licensor's patents, and in exchange the licensee gave the licensor the right to collect royalties on his patents. Later cases have restricted the extent to which patentees may extend their patent monopolies by using their legitimate royalty power to collect royalties on other items. Nevertheless, cases like *Zenith* encourage rather than forbid analysis of the genesis and application of licensing provisions. Therefore, we believe that the conclusion of the *Transparent-Wrap* Court that the provision is not per se illegal but should be analyzed in the context of its application remains a valid one, and that the trial court properly considered how the provision was employed by Brunswick and Hull.

■ The parties stipulated that no royalties have ever been paid by Brunswick with respect to any improvement patents except those granted to Hull himself. Hull has never claimed any royalties on improvements made by other Brunswick employees. In his letter of September 30, 1976, Hull said the provision "has been and continues to be wholly academic" and agreed to its elimination. Again, Brunswick raises only hypothetical situations in which this clause could inhibit Brunswick's ability to "invent around" the patents; Brunswick never established any instance in which innovation was actually inhibited. In light of Hull's nonenforcement and relinquishment of the provision, we think the trial court properly held that it did not relieve Brunswick of its royalty obligation under the contract. *See Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 835, 70 S.Ct. 894, 898, 94 L.Ed. 1312 (1950); *McCullough Tool Co. v. Well Surveys, Inc.,* 343 F.2d 381, 407–08 (10th Cir.1965), *cert. denied,* 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 *and* 385 U.S. 990, 87 S.Ct. 601, 17 L.Ed.2d 451 (1966); *Zajicek v. Koolvent*

*Metal Awning Corp. of America,* 283 F.2d 127, 132 (9th Cir.1960), *cert. denied,* 365 U.S. 859, 81 S.Ct. 827, 5 L.Ed.2d 823 (1961).

■ Article VII calls for the agreement to remain in force until expiration of the last of the patents under it unless the agreement is terminated earlier under the 30-day unilateral termination clause. Brunswick argues that requiring it to pay the full rate until the last patent expires is a misuse and relieves it of the obligation to pay at all. The provision does not on its face call for royalty payments to continue after the time that no unexpired patents are being used. *Compare Brulotte v. Thys Co.,* 379 U.S. 29, 32, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964) ("[U]se of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se.*"). As applied, it does not unlawfully extend Hull's patents past the expiration of their appointed lives.

The record establishes that Hull has never demanded and Brunswick has never paid royalties on a reel that did not include at least one Hull patent; the agreement requires payment only if a Hull patent is used. Thus, if at some future time there had remained unexpired Hull patents and Brunswick used one or more in a reel, the agreement would have required Brunswick to pay Hull 7%. If there had remained unexpired Hull patents and Brunswick used no Hull patent or only expired Hull patents, it would have had to pay Hull nothing, even though the agreement remained in force. This is precisely the situation that existed at the very outset of the contract and during all the years before it was terminated. If Brunswick used a Hull patent it paid, if not it did not pay. We have already determined that the method of payment employed by the parties was a valid one. This provision does not violate the letter or spirit of *Brulotte,* as it does not require payment for expired patents. *See id.* at 33, 85 S.Ct. at 179 (continued payment on package license when some but not all patents have expired is permissible, even when payment is based on sales of items that may employ no patents at all). It is remarkably similar

to a provision we upheld in *Well Surveys, Inc. v. Perfo-Log, Inc.,* 396 F.2d 15 (10th Cir.), *cert. denied,* 393 U.S. 951, 89 S.Ct. 374, 21 L.Ed.2d 362 (1968). We said there:

> "Although the royalty rate does not change, the base for that rate changes because after the expiration of [the] Swift [patent], no royalty is payable unless the Peterson patent is used in the logging operations. The lack of diminution in royalty rate for the use of [one patent] without [another] and the provisions for termination do not of themselves establish coercion. The question is whether the licensee was forced to enter into a package arrangement."

*Id.* at 17. *See also In re Yarn Processing Patent Validity Litigation,* 541 F.2d 1127, 1141–42 (5th Cir.1976) (provision that escalated royalties for one patent in package after expiration of another patent did not illegally extend life of first patent, on its face or as applied), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2976, 53 L.Ed.2d 1094 (1977). The provision does not preclude Hull from collecting royalty payments from Brunswick under the terms of the agreement.

### III

In addition to asserting its patent misuse defenses, Brunswick also argued below that Hull's patents were invalid. The court granted summary judgment in favor of Hull on this issue, ruling that patent invalidity was not a proper defense to a suit for royalties under the circumstances of this case. We agree.

Prior to *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), a licensee was held to be estopped from asserting patent invalidity if sued for unpaid royalties by the licensor. However, the Court in *Lear* recognized that "[l]icensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need of justification." *Id.* at 670, 89 S.Ct. at 1911. To remove the muzzle, the Court removed the estoppel.

*Lear* permits licensees to refuse to pay royalties on a patent they believe to be invalid and then to defend an action for royalties on the basis of patent invalidity. *See id.* at 673–74, 89 S.Ct. at 1912. Courts interpreting *Lear,* however, have focused on whether the suspension of royalty payments is connected to the challenge to the patent's validity. These cases hold that if licensees wish to preserve patent invalidity as a defense to litigation over unpaid royalties, the licensees must notify the licensors that they are suspending payments because they question the validity of the patents. *See Bristol Locknut Co. v. SPS Technologies, Inc.,* 677 F.2d 1277, 1283 (9th Cir.1982); *American Sterilizer Co. v. Sybron Corp.,* 614 F.2d 890, 895–98 (3d Cir.), *cert. denied,* 449 U.S. 825, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980); *PPG Industries, Inc. v. Westwood Chemical, Inc.,* 530 F.2d 700, 706 (6th Cir.), *cert. denied,* 429 U.S. 824, 97 S.Ct. 76, 50 L.Ed.2d 86 (1976); *see also Kraly v. National Distillers & Chemical Corp.,* 502 F.2d 1366, 1372 (7th Cir.1974). We agree that this limitation best effectuates the policies enunciated in *Lear.*

One reason *Lear* permits licensees to suspend royalty payments prior to a final judicial determination of validity is to discourage licensors from delaying such a determination. The Court feared that if licensees were required to continue making royalty payments during the pendency of a validity challenge, licensors would be encouraged to stall a judicial determination as long as possible. *See Lear,* 395 U.S. at 673–74, 89 S.Ct. at 1912. If licensees are permitted to suspend royalty payments without notifying licensors that the reason for the suspension is to question the validity of the patents, they will be subject to a similar temptation to forestall validity litigation. Licensees might draw licensors into protracted negotiation of other contract issues while continuing to use the patents under the licenses. The longer they could stall validity litigation, the greater the amount of royalties they could avoid while still enjoying the monopoly benefits conferred by the license. Permitting licensees to avoid royalties that

they suspended for reasons other than to challenge validity would give the licensees "additional economic incentive to devise every conceivable dilatory tactic in an effort to postpone the day of final judicial reckoning." *Id.* at 673, 89 S.Ct. at 1912. Limiting the royalties licensees can avoid to those accruing after the licensees effectively notify the licensors that they question the validity of the licensed patents prevents the rule in *Lear* from being used to frustrate the policies enunciated there.

In the instant case Brunswick first raised invalidity of the patents in its answer to the complaint, filed several months after it terminated the agreement. During the six months or so of negotiations between Brunswick and Hull, Brunswick never raised the question of the validity of any of the Hull patents. Its asserted goal was to obtain individual royalty rates for the patents without relinquishing its exclusive right to exploit them. The trial court found, "Had Plaintiffs gone along with Brunswick's request to set 'individualized royalty rates' ... Brunswick apparently would not have asserted any claims of invalidity." In these circumstances Brunswick cannot be permitted to avoid royalties accruing during the period of attempted negotiation of the royalty and other provisions of the agreement or during the period prior to its termination of the contract. Hence the trial court properly ruled that invalidity could not be a defense to the payment of royalties at issue in this case.

AFFIRMED.